NORTHERN STATES POWER
COMPANY Appellant,

v.

FIDELITY AND CASUALTY COMPANY
OF NEW YORK, Defendant,

St. Paul Fire and Marine Insurance Company, as itself and as successor in interest to Mercury Insurance Company, et al., Petitioners, Respondent.

No. C3–92–2363.

Supreme Court of Minnesota.

Sept. 30, 1994.

Larry D. Espel, Greene Espel, Minneapolis, for appellant.

Charles E. Spevacek, Meagher & Geer, Minneapolis, for respondent.

Charles E. Lundberg, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, and Wiley, Rein & Fielding, Washington, DC, for amicus Ins. Environmental Litigation Ass'n.

## OPINION

KEITH, Chief Justice.

In this appeal, we must decide how to allocate damages between multiple insurers on the risk for pollution clean-up costs. These costs were incurred by the insured, Northern States Power (NSP) when it complied with a Minnesota Pollution Control Agency (MPCA) order to clean up property contaminated by operations as a coal-tar gasification site in Faribault, Minnesota. NSP commenced this action for declaratory judgment in 1989.

The property in question involves two adjacent sites along the Straight River in Faribault. In 1873, the Faribault Gas Light Company constructed an oil and gas plant on one of the sites. The company consolidated in 1889 with the Faribault Electric Light Company, forming the Faribault Gas and Electric Company, and moved the plant to an adjacent lot. In 1897 the plant was rebuilt, and the processing method was changed from an oil to a water process. The Consumers Power Company purchased the Faribault Gas and Electric Company in 1910 and changed the processing method from a water to a coal process. Consumers Power Company became NSP in 1916. In 1924, NSP purchased the adjacent property and, in 1928, constructed another coal-gas facility on that property. NSP ceased operating the facilities sometime after 1933 and, between that year and 1978, sold both sites.

In 1981, the MPCA discovered that the groundwater at both sites was contaminated with coal tars and spent oxide waste; it subsequently urged NSP to investigate remedial measures. NSP did so from 1984 to 1987. In February of 1987, NSP notified its insurers of the potential liability. In June of 1988, NSP entered into a consent order whereby NSP was ultimately required to pay approximately $1,600,000 in response costs[1] (including interest at 8%, 7% and 5% per annum for different years from 1987 to 1992) to the MPCA, and to pay for monitoring costs of approximately $40,000 per year. NSP then sought coverage from the thirteen companies from which it had purchased comprehensive general liability (CGL) or environmental impairment liability insurance between 1946 and 1985. NSP eventually settled, on terms analogous to *Pierringer* agreements, with all carriers except St. Paul. *See*

*Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963).

Five St. Paul policies are at issue in this case. They are standard form CGL policies with self-insured retainers of $25,000 for the period from 1958 to 1970 and $100,000 for 1970 to 1973. The policies are labelled "Excess Liability Policy," but the record shows that no other insurer was providing primary coverage to NSP from 1958 to 1973. Each of the policies[2] provides that St. Paul agrees to pay:

> on behalf of the Insured *all sums* which the insured shall become legally obligated to pay as damages because of injury to or destruction of tangible property, including the loss of use thereof.

(Emphasis added). The policies further state, "the company's limit of liability * * * shall be $5,000,000 for each occurrence or series of occurrences arising out of one event," and "[t]his policy applies only to occurrences which occur during the policy period * * *." The policies additionally provide:

> If the insured's liability incurred under this policy is covered by any other valid and collectible insurance, this policy shall act as excess insurance over and above such other insurance.

The policies also contain exclusions for "injury to or destruction of property owned * * * by the insured."

At the trial court, NSP and St. Paul brought cross-motions for summary judgment. NSP argued that all carriers "on the risk" from 1946 to 1985 agreed to be liable for "all sums" which NSP became obligated to pay as the result of the property damage, and the carriers were therefore jointly and severally liable for $1.6 million. NSP based this argument on the assumption that, under Minnesota law all policies were "triggered"[3]

1. "Response costs" is a term of art defined by neither the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA or Superfund Act), 42 U.S.C. § 9601–57, nor the Minnesota Environmental Response and Liability Act, Minn.Stat. ch. 115B; however, both acts define "respond" and "response" as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(24) (1988); Minn.Stat. § 115B.02 subd. 18 (1992).

2. There are slight differences in the language used between the earlier and later policies. These differences are not significant.

3. A policy is "triggered" if the policy provides some coverage for damages. "To establish coverage under a particular policy, an insured must demonstrate that damage 'occurred' while the policy was in effect." William R. Hickman and Mary R. De Young, *Allocation of Environmental Cleanup Liability Between Successive Insurers*, 17

if they were on the risk at any time during which damage occurred, and damage occurred continuously from the date of operations to the present. NSP further argued that the trial court should apportion the damages between carriers "pro rata by limits."[4]

In response to NSP's claims, St. Paul made several arguments, including: that the definition of "actual injury" in Minnesota required that only those policies in effect when the contamination was manifested were "triggered;" that the policies' "owned property" exclusion precluded coverage because NSP had remedied contamination in the soil in order to prevent further contamination of the groundwater and the soil was NSP's property; and that the St. Paul policies' "other insurance" clauses made them "excess" to those of the settling carriers. The trial court rejected all but one of St. Paul's defenses, holding that the St. Paul policies' "other insurance" clauses did not conflict with the "other insurance" clauses of the other policies at issue in the case, that St. Paul's policies therefore acted as "excess" to the other policies, and that NSP had failed to show that the other policies provided insufficient coverage to meet its costs. The trial court therefore granted St. Paul's motion for summary judgment.

The court of appeals reversed the trial court and remanded the case, holding that the "total policy insuring intent" should have been analyzed to determine whether St. Paul's policies provided primary coverage and, under that analysis, St. Paul's policies provided primary coverage. *Northern States Power Co. v. Fidelity and Cas. Co.*, 504 N.W.2d 240, 244–45 (Minn.App.1993). The court of appeals also held that there was a genuine issue of material fact regarding whether all of the MPCA mandated expenditures were required to remedy existing contamination and whether the "owned property" exclusion precluded coverage for certain damages. *Id.* at 245–46. Finally, the court of appeals held that damages were to be allocated among the carriers in proportion to the injuries that occurred during each policy period, and that NSP would be required to satisfy its self-insured retention on each policy under which it sought coverage. *Id.* at 247 (citing *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368 (E.D.N.Y.1988)). This court granted review only as to the "other insurance" and allocation of damages issues. These issues are related and have been analyzed together by this court. We modify the court of appeals' decision with respect to the allocation of damages and affirm the court of appeals' result with respect to the "other insurance" clause, but on other grounds.

■ Environmental liability insurance cases create special problems for litigants and courts. The stakes in these cases can be extremely high. "The average cost of remedying hazardous conditions at a site on the Superfund 'National Priority List' now exceeds $30 million." Kenneth S. Abraham, *Cleaning Up the Environmental Liability Insurance Mess*, 27 Val.U.L.Rev. 601, 603 (1993) [hereinafter *Cleaning Up* ]. "The cost of hazardous waste cleanup under the federal Superfund program and analogous state regimes * * * is likely to be several hundred billion dollars before these programs are completed." Kenneth S. Abraham, *Environmental Liability Insurance Law: An Analysis of Toxic Tort and Hazardous Waste Insurance Coverage Issues*, 1 (1991) [hereinafter *Analysis* ]. While several commentators argue that the insurance industry expected to be held liable for damages to property due to pollution,[5] it seems unlikely that the par-

---

N.Ky.L.Rev. 291, 293 (1990) [hereinafter *Allocation Between Successive Insurers* ].

**4.** This is the method of allocation this court applies in cases involving multiple insurers concurrently liable for the same damages. *See Woodrich Construction Co. v. Indemnity Ins. Co.*, 252 Minn. 86, 102, 89 N.W.2d 412, 423 (1958). Initially, NSP argued it could choose a single policy—and it chose St. Paul's for 1957—and could make a claim for damages under that policy, paying only one deductible and obtaining that

policy's full limits; the carrier issuing the policy was then free to seek contribution from the other carriers. This argument has been accepted by at least one court. *See Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 1047–49 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 875 (1982), *reh'g denied*, 456 U.S. 951, 102 S.Ct. 2024, 72 L.Ed.2d 476 (1982).

**5.** *See* Thomas C. Mielenhausen, *Insurance Coverage for Environmental and Toxic Tort Claims*, 17 Wm. Mitchell L.Rev. 945, 950–51 (1991) ("Over

ties to these actions anticipated the extent of the liability they now face as the result of CERCLA and its state equivalents. CERCLA imposes strict liability for "response" (cleanup) costs and may be applied retroactively. *See* 42 U.S.C. § 9607 (1988); *Analysis*, at 11. Furthermore, the costs of "response," defined by CERCLA as "remedial action," are theoretically limitless, and cannot be estimated by, for example, the value of the property at issue. *See* 42 U.S.C. § 9601(25) (1988). This makes it difficult for insurers to assess the risks they may incur. *Cf., Allocation Between Successive Insurers* at 301–02.

We have held that claims for "response costs" may qualify as "damages" under standard CGL policies. *Minnesota Mining & Mfg. v. Travelers Indem. Co.*, 457 N.W.2d 175, 184 (Minn.1990). In this case, however, we are not faced with the question of whether these claims are "damages," but with how to allocate liability between insurers. This is a very different issue, one which may require a more flexible approach. As with all insurance contract-related issues, courts must consider many factors when deciding this issue, including the policy language, parties' intent or reasonable expectations, canons of construction and public policy. *See, e.g., Atwater Creamery Co. v. Western Nat. Mut. Ins. Co.*, 366 N.W.2d 271, 276–77 (Minn.1985); *Nordby v. Atlantic Mut. Ins. Co.*, 329 N.W.2d 820, 822 (Minn.1983); *Dairyland Ins. Co. v. Implement Dealers Ins. Co.*, 294 Minn. 236, 244–245, 199 N.W.2d 806, 811 (1972).

Environmental liability insurance cases raise a variety of issues, such as: what "trigger theory" should a court apply to determine which policies are at issue; are the damages excluded by various provisions in the policies, such as the "owned property" and pollution exclusions; how should a court determine the number of "occurrences" un-

der the policies; what method of allocation between successive insurers is most appropriate; how or whether a court should apply the policies' "other insurance" clauses; how should a court deal with self-insured retainers or deductibles; and how should a court deal with periods, if any, during which the policyholder was self-insured? *See Allocation Between Successive Insurers; Analysis*, at 163–73. These issues are strongly interrelated. The policy reasons for choosing a particular "trigger theory," for example, will be relevant to deciding the appropriate method of allocation.

Several commentators have discussed typical coverage-related issues. *E.g., Analysis; Cleaning Up;* Mark Shelton F. Williams, *Insurance Coverage of Environmental Liability in Montana*, 54 Mont.L.Rev. 105 (1993); Eugene R. Anderson, Catherine M. Ward, John P. Winsbro, *Environmental Insurance Coverage in New Jersey: A Tale of Two Stories*, 24 Rutgers L.J. 83 (1992); Jacquelyn A. Beatty, *Exclusions Exclude: Let the Pollution Mean What It Says*, 28 Gonzaga L.Rev. 401 (1992); Thomas C. Mielenhausen, *Insurance Coverage for Environmental and Toxic Tort Claims*, 17 Wm. Mitchell L.Rev. 945 (1991). Unfortunately, few authorities address allocation between successive insurers once coverage has been found. *Allocation Between Successive Insurers*, at 291–92.

█ Moving to our analysis of this case, we agree with the trial court's conclusion of law that NSP's cleanup costs may constitute "sums which the insured [became] legally obligated to pay * * * as damages" because of injury to property. *See Minnesota Mining and Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 179–82 (Minn.1990). Furthermore, it appears from the record that at least some of these costs will not be barred

---

the past decades, the insurance industry has repeatedly acknowledged that its basic insuring agreement covers liabilities arising from pollution and hazardous substances"); Eugene R. Anderson, Catherine M. Ward, John P. Winsbro, *Environmental Insurance Coverage in New Jersey: A Tale of Two Stories*, 24 Rutgers L.J. 83, 106–14 (1992) (noting extent to which insurance industry

anticipated environmental damage * * * claims); *cf., Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 183 (Minn.1990) (noting that insurers were aware, at the time they entered into the insurance policies at issue, of the potential liability for groundwater contamination).

by the "owned property" exclusion.[6] Therefore, in deciding whether summary judgment for St. Paul was appropriate, this court must determine whether the St. Paul policies may have been "triggered."

In these cases, courts tend to follow one of four "trigger" theories to determine which policies were "on the risk:" the "exposure" rule, whereby only those policies in effect when the claimant or property was exposed to hazardous materials are triggered; the "manifestation" rule, whereby only those policies in effect when the injury or damage was discovered are triggered; the "continuous trigger" where the policies in effect at the time of exposure, the time of manifestation, and all the time in between are triggered; and the "actual injury" or "injury-in-fact" trigger, whereby only those policies in effect when damage occurred are triggered. *See generally Analysis,* at 98–102; *Allocation Between Successive Insurers,* at 293–96. Minnesota follows the "actual injury" or "injury-in-fact" theory to determine which policies have been triggered by an occurrence causing damages for which an insured is liable. *Cf., Singsaas v. Diederich,* 307 Minn. 153, 155–56, 238 N.W.2d 878, 880–81 (1976) (emphasizing that insurer agreed to be liable for damages incurred during the policy period.) The court of appeals applied this trigger theory to long-term groundwater contamination in *Industrial Steel Container Co., by Rutman v. Fireman's Fund Ins. Co.,* 399 N.W.2d 156, 159–60 (Minn.App.1987), *pet. for rev. denied* (Minn.1987). We believe this theory is the most consistent with standard CGL policy language.

As we noted above, the choice of trigger theory is related to the method a court will choose to allocate damages between insurers. NSP urges this court to apply a "pro rata by limits" allocation method, arguing that St. Paul is liable for the full extent of the damages because it agreed to pay "all sums" which NSP became legally obligated to pay as damages because of injury to property.

NSP further argues that, because St. Paul, as well as NSP's other insurers, agreed to be liable for the full extent of the damages, the insurers are all equally liable and this court should apportion liability in a manner consistent with insurance precedent, namely "pro rata by limits." We are not persuaded. A "pro rata by limits" allocation method is inconsistent with the actual injury trigger theory.

The essence of the actual injury trigger theory is that each insurer is held liable for only those damages which occurred during its policy period; no insurer is held liable for damages outside its policy period. Where the policy periods do not overlap, therefore, the insurers are *consecutively,* not *concurrently* liable. A "pro rata by limits" allocation method effectively makes those insurers with higher limits liable for damages incurred outside their policy periods and is therefore inconsistent with the actual injury trigger theory.

The question therefore becomes, how may a court allocate damages consistent with the "actual injury" trigger theory? One option would be to apportion the damages as proven; in other words, each policy would cover only those damages that are allocable to harm which occurred during the policy period. This is the approach followed by the court of appeals in this case. *Northern States Power Co.,* 504 N.W.2d 240, 247 (Minn.App.1993) (citing *Uniroyal, Inc. v. Home Insurance Co.,* 707 F.Supp. 1368 (E.D.N.Y.1988)). A second option would allocate damages pro rata by each insurer's "time on the risk." *See Insurance Co. of North America v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir.1980), *rehearing granted, opinion clarified* at 657 F.2d 814 (6th Cir.1981), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 76 (E.D.Mich.1987). These two options provide the same result when, as may

---

**6.** "Pollution of the groundwater is damage to public property." *Id.* at 182. The court of appeals determined that the record raised an issue of fact regarding whether some of NSP's costs might be barred by the "owned property" exclusion. *Northern States Power v. Fidelity and Cas.*

*Co.,* 504 N.W.2d 240, 246 (Minn.App.1993). We agreed and therefore did not review this issue.

For a helpful discussion of the relationship between the "owned property" exclusion and the trigger of coverage, see *Analysis,* at 172–73.

be the case here, the damages are continuous over all policy periods.

The primary advantage of the first option, allocating damages to each policy "as proven," is that it is completely consistent with CGL policy language limiting liability to damages incurred "during the policy period." Practically, however, this option is unattractive given the scientific complexity of the issues involved, the extended period of time over which damages may have occurred before discovery, and the number of parties potentially involved. As one commentator has noted:

> [H]olding each policy to cover only that portion of the insured's liability that is allocable to the harm which occurred in the year in question * * * may be theoretically satisfying, but will almost always be infeasible. Given the progressive nature of the environmental harms in question, finding the facts necessary to apply this approach usually would be administratively difficult, scientifically impossible, or both. Consequently, the real issue is which approach to apply when for all practical purposes the bodily injury or property damage suffered during different policy periods is indivisible.

*Analysis* at 120.

Where it is scientifically possible to prove the amount of harm occurring during each policy period, it may be nonetheless too expensive to do so in cases involving relatively small total damages. At the same time, the extremely fact-dependent nature of such an allocation scheme may reduce the likelihood of settlement. Finally, as a public policy matter, this court cannot ignore the enormous difficulty insureds would face if, as is generally the case, they had the burden of proving the *amount* of damages for each policy at issue.[7]

By contrast, a "pro rata by time on the risk" allocation scheme could reduce the costs of litigation because it is more or less a per se rule. *See generally Analysis* at 3–4, 104–06. This method assumes that the damages in a contamination case are evenly distributed (or continuous) through each policy period from the first point at which damages occurred to the time of discovery, cleanup or whenever the last triggered policy period ended. Each triggered policy therefore bears a share of the total damages proportionate to the number of years it was on the risk relative to the total number of years of coverage triggered. *Allocation Between Successive Insurers* at 306. While such an allocation scheme is attractive for its simplicity, we recognize that damages are by nature fact-dependent and that trial courts must be given the flexibility to apportion them in a manner befitting each case.

■■■ In response to these concerns, we suggest trial courts consider the following procedural guidelines when apportioning damages in these types of cases.[8] First, as we have already noted, in order to trigger a policy the insured must show that *some damage* occurred during the policy period. Consistent with long-standing principles of insurance law, the insured bears the burden of proving the policy was "triggered" and therefore that coverage is available. 19 George J. Couch, et al., *Couch on Insurance*, § 79.345 (2d rev. ed. 1983). It is sufficient in these cases, however, if the insured shows damage began on a particular date, X, and ended on, or was discovered at, a later date, Y, which

---

7. Arising as it does out of a summary judgment, we do not have the benefit of the trial court's findings of fact, nor a complete record, in this appeal, but the facts of this case illustrate the problem the courts and parties can face in an environmental liability insurance case. As it stands, the record reveals the following: there were at least thirteen different insurance companies involved in this case prior to settlement; if contaminants began seeping into the groundwater shortly after operations began, the period over which damages were incurred could have been as long as 100 years; the periods of the policies at issue in the case, while generally about 3 years, were sometimes as short as 6 months; and the total damages were "only" approximately $1,600,000. It is easy to see how, if each insurer held the insured to its burden of proof with respect to every policy, the costs of litigation might exceed the amount the insured could expect to recover, particularly when the self-insured retainers are taken into account.

8. These statements are intended to be guidelines to assist the trial court and do not limit the trial court's discretion to organize the trial of a case or fashion jury instructions, special verdict forms and the like.

period of time includes the policy periods for the policies at issue. Finally, the insured bears the burden of proving the total amount of damages for which coverage may exist.

■ Where, as in this case, the damages occurred over multiple policy periods, the trial court should presume that the damages were continuous from the point of the first damage to the point of discovery or cleanup. A party wishing to show that no appreciable damage occurred during a triggered policy period bears the burden of proving that fact.

■ Once it has been determined that the coverage of an insurance policy has been properly invoked, the trial court should then determine the amount of the insurer's liability with respect to that policy. We have already concluded that the contamination of the groundwater should be regarded as a continuous process in which the property damage is evenly distributed over the period of time from the first contamination to the end of the last triggered policy (or self-insured) period, and we have also held that the total amount of the property damage should be allocated to the various policies in proportion to the period of time each was on the risk. If, for example, contamination occurred over a period of 10 years, ⅒th of the damage would be allocable to the period of time that a policy in force for 1 year was on the risk and ⅗ths of the damage would be allocable to the period of time a 3–year policy was in force. The amount so determined does not, however, necessarily represent the amount of the insurer's liability with respect to that policy.

The St. Paul policies in question are excess liability policies in some of which the insured agrees to pay the first $25,000 for each occurrence and the insurer agrees to indemnify the insured up to the limits of its liability for each occurrence. In the other St. Paul policies, NSP agrees that it will pay the first $100,000 for each occurrence and St. Paul agrees that its limit of liability under its insuring agreement with respect to personal injury, property damage and advertising liability is $5 million for each occurrence.

■ Because at least one occurrence was required to invoke the coverage of each triggered policy, it seems apparent that NSP is responsible to the extent of its applicable retained limit in connection with each triggered St. Paul policy. We are not unaware that this conclusion is a departure from our decision in *Jostens, Inc. v. CNA Ins./Continental Cas. Co.*, 403 N.W.2d 625, 631 (Minn. 1987), in which we held the insured responsible for the average retained limits of two consecutive policies. Having determined that soil and groundwater contamination is a continuous process and that the damage should be spread evenly over the relevant period of time, we have struggled with determining the number of occurrences. Like the federal district court in one of the "Agent Orange" cases, we have concluded that the discharge or escape of coal tar and oxide contaminates has been so continuous and repetitive that the unidentifiable individual instances have merged into one continuing occurrence. *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1383–85 (E.D.N.Y.1988). We hold, therefore, that there has been one occurrence during the policy period of each applicable St. Paul policy and NSP must assume the retained limit with respect to each of these policies. St. Paul is liable for the excess portion of the damages allocated to each policy up to the policy limit for one occurrence. To the extent then that *Jostens, Inc. v. CNA Ins./Continental Cas. Co.*, 403 N.W.2d 625 (Minn.1987) conflicts with our decision here, it is overruled.

Because we have determined the appropriate method of allocating damages in these types of cases and because the record does not indicate that there was "other insurance" in effect during the period of time a St. Paul policy was in effect, we affirm the result, but modify the discussion offered by the court of appeals with regard to "other insurance" clauses. In our view, an application of *Integrity Mut. Ins. v. State Auto & Cas. Underwriters Ins. Co.*, 307 Minn. 173, 239 N.W.2d 445 (1976) to the facts presented is inappropriate. *Integrity* involved an allocation problem between multiple insurance policies concurrently liable for damages arising out of a single, discrete occurrence, not the factual setting presented here where there is no concurrent liability.

We do not expect that this case will be the "last word" in this area. Environmental liability insurance law, like any other area of law, will have to develop over time and trial courts must be flexible in responding to new fact situations. We affirm the court of appeals' decision as modified, and remand the case to the trial court for further proceedings consistent with this opinion.

COYNE and ANDERSON, JJ., took no part in the consideration or decision of this case.