No. 94-3283MNST

```
                                   *
FIREMAN'S FUND INSURANCE           *
COMPANY, a subrogee of Kraus-      *
Anderson Construction Company,     *
a member of the Devco/Kraus-       *
Anderson Joint Venture;            *
                                   *
         Plaintiff,                *
                                   *
DEVCO/KRAUS-ANDERSON JOINT         *   Appeal from the United States
VENTURE, a Minnesota Joint         *   District Court for the
Venture,                           *   District of Minnesota
                                   *
         Plaintiff-Appellant,      *
                                   *
v.                                 *
                                   *
THE HARTFORD FIRE INSURANCE        *
COMPANY,                           *
         Defendant-Appellee.       *
                                   *
```

```
                       ----------
             Submitted:  May 17, 1995

               Filed:  January 11, 1996

                       -----------
```
Before:  FAGG, Circuit Judge, and WOOD, JR.,[*] and JOHN R. GIBSON, Senior Circuit Judges.
```
                       -----------
```

HARLINGTON WOOD, JR., <u>Senior Circuit Judge</u>:

     This diversity case is a declaratory judgment action to determine whether appellee Hartford Fire Insurance Company (Hartford) has any obligation to defend or indemnify appellant

---

[*]  The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit Court of Appeals, sitting by designation.

Devco/Kraus-Anderson Joint Venture (DKA) with respect to two claims arising out of damages to the Piper Jaffray Tower (Tower), an office building in Minneapolis, Minnesota. The district court found no duty either to defend or indemnify, and the plaintiffs appealed.

I.  BACKGROUND & PROCEDURAL HISTORY

The facts of this case are essentially undisputed. In November, 1982, DKA began construction of the Tower as the general contractor. This construction included the installation of a fire protection system utilizing a six-inch standpipe to transport water vertically in the Tower's stairwells. On the sixth floor of the building, the standpipe makes a horizontal run crossing from one stairwell to another, its weight supported by a series of hangers and braces. The system also includes two fire pumps that utilize "trip" settings to determine at what level of pressure the pumps will engage. These settings require periodic monitoring.

Sometime after the Tower was completed in 1985, the trip settings were improperly reset. This caused a severe "water hammer" effect in the pipes whenever the system was activated for routine maintenance or to wash garage floors. This "water hammer," in turn, perhaps in combination with inappropriate or defective building materials, caused the hangers and braces supporting the horizontal section of pipe to loosen and become bent or displaced. These effects on the standpipe's support system were noticed by Tower maintenance personnel early in 1988, and an independent company undertook minor repairs. No one examined the trip settings, however, so the cycle began again: "water hammer," support system deterioration, and repair of symptoms rather than cause. Eventually, sagging under its own weight, the horizontal standpipe separated at a joint coupling on May 7, 1989, flooding the Tower with water and causing significant damage.

Two lawsuits ensued. The first, brought by the Arkwright

2

Mutual Insurance Company (<u>Arkwright</u>) as the subrogee of the owners of the Tower, sought recovery from DKA and others for the water damage occurring on May 7, 1989.  The second, brought by Piper Jaffray & Hopwood, Inc. (<u>Piper</u>) as a tenant of the Tower, sought recovery for water damage on the same set of facts.

During the initial stages of this series of events, DKA was insured by Hartford under a comprehensive general insurance policy.  The policy in question provided that:

> [Hartford] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .  This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period.  The "bodily injury" or "property damage" must be caused by an "occurrence.". . .
>
> . . . .
>
> "Occurrence" means an accident, including continuous or

repeated exposure to substantially the same generally harmful conditions.
. . . .

"Property damage" means:
(a) Physical injury to tangible property, including all resulting loss of use of that property; or

(b) Loss of use of tangible property that is not physically injured.

This coverage,[1] begun in 1984, was renewed several times but allowed to expire on December 1, 1988, after the initial minor repairs to the standpipe but before its ultimate failure. No claim was filed at the time for the repairs.

DKA tendered the defense of the Arkwright suit to Hartford in 1990 and again in 1992, alleging that the water damage in 1989 was related to the earlier "damage" to the hangers and bracing system that occurred while Hartford was "on the risk." Hartford rejected both tenders, claiming no coverage for damages occurring outside the policy period. Fireman's Fund Insurance Company, which provided coverage to the Kraus-Anderson Construction Company (a participant in the DKA joint venture) following the expiration of the Hartford policy and the dissolution of the DKA joint venture in 1990, ultimately settled both the Arkwright and Piper suits.

In the present action, DKA challenges Hartford's denial of coverage and seeks to recover from Hartford the attorneys' fees and settlement costs of the two prior actions along with this one. To accomplish this, DKA sought a declaratory judgment from the district court to establish Hartford's duty to defend and indemnify DKA for the underlying suits according to the terms of the policy described above. On cross motions for summary judgment, however, the district court held that neither duty existed. Addressing the duty to indemnify, the district court,

---

[1] The policies in force over this period varied somewhat, but the differences are not raised by either party as significant to this case.

4

applying Minnesota law, found that the "actual injury" rule determined whether and when coverage is triggered by an "occurrence" causing damages.  The court concluded that since the actual water damage occurred outside Hartford's policy period and could be distinguished from the gradual deterioration of the standpipe's support system, the Hartford policy did not apply. In terms of the duty to defend, the court found that the <u>Piper</u> plaintiffs lacked a compensable interest and therefore had no standing to bring their claims, while the <u>Arkwright</u> plaintiffs alleged no damages resulting from events prior to the ultimate failure of the standpipe on May 7, 1989.  The court thus concluded that neither suit was arguably within Hartford's coverage, thus no duty to defend arose.  This appeal followed.

II.  ANALYSIS

We review the entry of summary judgment <u>de novo</u>, as we do the district court's determination of Minnesota law.  <u>Burnette Techno-Metrics, Inc. v. TSI, Inc.</u>, 44 F.3d 641, 642 (8th Cir. 1994).  The parties have agreed to adopt the facts as alleged in DKA's complaint and statement of the case, therefore our task is to decide whether summary judgment was proper as a matter of law considering the terms of the policy at issue and the insurance law of Minnesota.

A.  The Duty to Indemnify

On appeal, DKA alleges that the district court improperly characterized the facts involved, misinterpreted the language of Hartford's policy, and erroneously relied on the "actual injury" rule of <u>Singsaas v. Diederich</u>, 238 N.W.2d 878 (Minn. 1976), in deciding that no duty to indemnify existed.  These arguments are mutually dependent, and will be discussed together. Fundamental to DKA's entire indemnification argument is its interpretation of the coverage clause of the policy.  This clause, DKA emphasizes, states that Hartford "will pay those sums that the insured becomes legally obligated to pay as damages <u>because of</u> 'bodily injury' or 'property damage' to which this

5

insurance applies" (emphasis supplied).  To summarize its arguments, DKA would interpret this clause as covering all consequential damages, including those occurring after the policy period, resulting from any "injury" sustained by covered property during the policy period.  Reading this coverage clause in conjunction with prevailing Minnesota cases and considering the circumstances here, however, we believe this interpretation is incorrect.

The policy language on which DKA relies has been, in various forms, part of standardized comprehensive liability insurance forms for quite some time.  See, e.g., Robert E. Keeton, Insurance Law §§ 2.11(c), 5.10(d) (1971).  Unfortunately, efforts to clarify the precise intent of the terms and wording of such policies by shifting phrasing patterns or changing definitions have often been ineffective.  Several cases cited by the parties have dealt with consequential damage coverage issues similar to those discussed here, yet the difficulty persists.  Hartford asserts that the wording of the new standard form at issue here, which does not explicitly require damages to result within the policy period, was made "more readable" by moving the older definition of "occurrence" ("an accident resulting, during the policy period, in bodily injury or property damage") into the coverage grant ("This insurance applies only to . . . 'property damage' which occurs during the policy period.").  This may be so, but risking protracted litigation to achieve better readability is a dubious venture, especially where substantive issues like consequential damages are potentially affected.

Nevertheless, though Minnesota courts ordinarily interpret ambiguous policy language strictly in favor of the insured, see State Farm Ins. Cos. v. Seefeld, 481 N.W.2d 62, 64 (Minn. 1992), this is not a case of simple ambiguity.  Other factors influence our decision.  First is the question of whether the facts here trigger an "occurrence" under this policy.  The Minnesota Supreme Court has adopted the "actual injury" test to determine when coverage applies.  See Singsaas v. Diederich, 238 N.W.2d 878

6

(1976). In Singsaas, the defendant company negligently performed work on a "manlift" elevator by using a soft metal part to secure the lifting cable to the elevator car. Id. at 879. The plaintiff was severely injured when the soft metal connection deteriorated and separated from the cable, causing the elevator to fall. Id. at 880. The defendant was insured while it performed the repair work and during most of the period of the connection's deterioration, but terminated the policy before the elevator's fall. Id. The defendant sought coverage for the plaintiff's damages on the theory that the "accident" consisted of the negligent installation and subsequent deterioration of the part, all occurring during the policy period. Id. at 881. The Minnesota Supreme Court rejected this theory, however, and adopted the general rule that "the time of the occurrence is not the time the wrongful act was committed but the time the complaining party was actually damaged." Id. at 880 (citations omitted).

In this case, the district court found that the alleged damages to the pipe's support system were similar to the gradual deterioration involved in the Singsaas case, and that the later water damage alone was the relevant injury. We find this analogy persuasive. Against the background of the actual injury rule, the simple--and tenuously related--issue of causation in this case is insufficient to trigger the obligation to indemnify. Our conclusion is supported by the fact that the limited and inexpensive repairs to the pipe's supporting system could easily be characterized as measures to prevent unknown future damage only, and thus would be outside the definition of "property damage." See Northern States Power Co. v. Fidelity & Casualty Co. of New York, 504 N.W.2d 240, 245-46 (Minn. Ct. App. 1993) ("Expenditures to prevent future [damage] of a type which has yet to occur or from a source which has yet to cause [damage], however, are not covered because these costs are not causally related to the property damage."), aff'd as modified on other grounds, 523 N.W.2d 657 (Minn. 1994). No damages were claimed

when the pipe's support system underwent repair, nor were any damages to this system claimed as a basis for the underlying _Piper_ and _Arkwright_ suits, which focused exclusively on the later water damage.

Second, turning to the policy language, while the actual damages rule of _Singsaas_ was accepted in the context of an older version of the standard policy, more recent cases from the Minnesota Supreme Court have found the rule applicable to the newer standard forms as well. _See_ _Jostens, Inc. v. CNA Ins._, 403 N.W.2d 625, 630 (Minn. 1987), _overruled on other grounds by Northern States Power Co. v. Fidelity & Casualty Co. of New York_, 523 N.W.2d 657 (Minn. 1994). DKA cites two cases which rely in part on different interpretations of policy language similar to the current form, _see_ _Federated Mutual Ins. Co. v. Concrete Units, Inc._, 363 N.W.2d 751 (Minn. 1985); _St. Paul Fire & Marine Ins. Co. v. National Chiropractic Mutual Ins. Co._, 496 N.W.2d 411 (Minn. Ct. App. 1993), but these cases are not based on the precise issues considered here, nor do they involve the same coverage or triggering requirements.

Finally, when more than one insurer is involved (consecutively), as the evidence here indicates, the Minnesota Supreme Court has stated that the actual damages rule is "strongly interrelated" to, and must be resolved consistently with, the allocation issue: "The essence of the actual injury trigger theory is that each insurer is held liable for only those damages which occurred during its policy period; no insurer is held liable for damages outside its policy period." _Northern States Power Co. v. Fidelity & Casualty Co. of New York_, 523 N.W.2d 657, 662 (Minn. 1994). While this concern may not dictate the outcome of every multiple insurer case where causation and policy language are in question, it is relevant and appropriately considered here.

These factors lead us to conclude that no duty of indemnification existed, and we affirm the district court on this issue.

B.  The Duty to Defend

The duty to defend under an insurance policy is broader than the duty to indemnify.  St. Paul Fire & Marine Ins. Co. v. Briggs, 464 N.W.2d 535, 539 (Minn. Ct. App. 1990).  An insurer's obligation to defend is contractual in nature and is determined by the allegations of the complaint; if any part of a cause of action is arguably within the scope of coverage, the insurer must defend.  Prahm v. Rupp Constr. Co., 277 N.W.2d 389, 390 (Minn. 1979).

Looking to the complaints in the underlying cases here, the district court concluded that the Piper claimants, the tenants of the Tower who had no ownership interest in the building or its fire protection system, had no standing to bring claims for damages based on injuries to those items.  That finding is not challenged on appeal.

The Arkwright complaint alleged that the inadequate support system for the standpipe directly caused the coupling's separation and the ultimate water damage.  In the "wherefore" clause of the complaint, the Arkwright plaintiffs sought damages including:

> (a)  Amounts for the cost of repair and restoration to the Piper Jaffray Tower Building structure, including but not limited to its structural, mechanical, electrical, fire protection, water, elevator, and other building systems; . . .

The complaint, however, alleges no specific damages prior to the May 7, 1989 date of the water damage.  DKA asserts that Hartford knew of its claim for $753 for materials to repair the "fire protection" (standpipe) system, but these repairs were undertaken after the pipe separation and water damage on May 7, 1989.

After discovery had taken place, DKA again submitted a tender of defense, notifying Hartford of its conclusions and coverage theory.  This theory was similar to that stated above with respect to indemnification; it rested entirely on an interpretation of the policy and the facts at odds with the

9

actual damages rule of <u>Sinqsaas</u>.  In view of our discussion of that theory above, we agree with the district court that claims based on it were not "arguably within the scope of the policy's coverage."  <u>St. Paul Fire & Marine</u>, 490 N.W.2d at 632.

For the foregoing reasons, the district court's grant of summary judgment in favor of Hartford is AFFIRMED.


A true copy.

ATTEST:


Clerk, U.S. Court of Appeals, Eighth Circuit.