**WESTLING MANUFACTURING COMPANY, INC.,**
**Respondent,**

v.

**WESTERN NATIONAL MUTUAL INSURANCE COMPANY,**
**Appellant (C7–97–1882),**

**Employers Mutual Casualty Company,**
**Appellant (C5–97–1878).**

**Nos. C5–97–1878, C7–97–1882.**

Court of Appeals of Minnesota.

July 7, 1998.

Review Denied Sept. 22, 1998.

James T. Martin, Dan T. Ryerson, Gislason, Martin & Varpness, P.A., Edina, for appellant Western National Mutual Insurance Company.

Dale O. Thornsjo, Esq., Johnson & Condon, P.A., Minneapolis, for appellant Employers Mutual Casualty Company.

William L. Lucas, Edina, for respondent Westling Manufacturing Company, Inc.

Considered and decided by CRIPPEN, P.J., and DAVIES and HARTEN, JJ.

## OPINION

CRIPPEN, Judge.

According to a trial court conclusion, premised on a special jury verdict, respondent Westling Manufacturing Company proved that contamination to the groundwater under and in the vicinity of its property resulted from a sudden and accidental release during a period in which Westling was covered by appellant insurers. The insurers, the court also determined, did not prove that other, ongoing spillage was an overriding cause of the groundwater contamination; thus the court refused to allocate damages over all years in which there was evidence of groundwater contamination. The court concluded that the insurers had a duty to indemnify Westling for liability incurred in proceedings by the Minnesota Pollution Control Agency (MPCA), and that one of the insurers had a duty to defend that suit. Finally, the court awarded Westling its attorney fees and prejudgment interest. We affirm.

## FACTS

Westling Manufacturing Company is a business that cleans and rebuilds used automobile parts. Between June 1979 and June 1984, Westling was insured by Western National Mutual Insurance Company. The Western National policy included a duty to defend. Between June 1980 and June 1984, Westling was also insured under an umbrella policy issued by Employers Mutual Casualty Company. Both policies contained qualified pollution exclusions, denying coverage for property damage arising out of the discharge, release, or escape of contaminants or pollutants, unless such discharge, release, or escape was sudden and accidental.

Westling used a vapor degreaser on a daily basis to clean some automobile parts. The vapor degreaser was a large tank in which cleaning solvent was boiled into a vapor. The cleaning solvent used in the vapor degreaser was known as "perc," a volatile organic compound. The vapor degreaser was located on the floor of the main building, near the west wall. There was evidence that perc was spilled when it was delivered to the facility, when auto parts were removed from the vapor degreaser, and when the vapor degreaser was cleaned.

In the late 1970s, the used perc was stored in barrels on a concrete pad at the southwest corner of the warehouse. In September 1983, Westling hired a recycling service to haul away the used perc. There was no specific evidence that a spill of used perc occurred when the barrels were on or removed from the concrete pad.

In May 1985, a neighbor to the south of Westling's property, Airway Products, discovered perc in a sand-point well, and the MPCA began conducting tests to determine Airway Products' exposure and liability. In January 1990, an engineering firm, Wenck and Associates, informed Westling that there was perc contamination in the groundwater under its property, and Westling began pumping and treating the groundwater pursuant to a system proposed by Wenck. The MPCA asked that the system be shut down, pending further analysis of the groundwater, and Westling performed additional testing of the groundwater, pursuant to the MPCA's demands.

In July 1992, Westling tendered defense of the MPCA's action to Western National and sued Western National and Employers Mutual for coverage, indicating that the MPCA was threatening to issue a Request for Response Action. Western National denied a duty to defend for several reasons, including a claim that the groundwater contamination was not sudden and accidental. The MPCA later decided not to issue a Request for Response Action, in light of Westling's cooperation.

Paul Josephson, Wenck's project manager, testified at trial that most of the perc in the groundwater came from the concrete pad, although some came from the location of the vapor degreaser. He believed that the source of the 1985 contamination in the Airway Products well was a spill that had occurred on the concrete pad and had flowed to the west. He testified that perc escaping from the vapor degreaser could not have accounted for that contamination, because the groundwater did not flow in that direction, and because the perc concentrations at the location of the vapor degreaser were smaller than the concentrations in the well.

Josephson testified that when the large spill of perc occurred near the concrete pad, it would not have entered the groundwater instantaneously, but when the perc did enter the groundwater for the first time, it would have been sudden. This testimony was supported by evidence that the well sample collected in May 1985 contained perc levels of 8,300 parts per billion, whereas a sample collected the next month from the same well indicated that the perc level had dropped substantially, to 530 parts per billion. Josephson testified that he believed the perc suddenly entered the groundwater for the first time sometime between December 1983 and March 1984.

John Erdmann, another environmental engineer for Wenck, testified that the contamination of the groundwater discovered in the well was sudden, and that the contamination after that initial release was an ongoing process. He agreed with Josephson that spills near the vapor degreaser could not have impacted the well because of the direction of the groundwater flow, which was from northwest to southeast. He explained that there may have been an elevated level of perc under the vapor degreaser because the contaminants were trapped by the floor and had never been washed away by infiltrating rainwater. Based on the density and porosity of the soil and the nature of perc, along with the organic carbon content of the aquifer material, the slope of the water table, and the soil's hydraulic conductivity, Erdmann calculated that the perc was released between July 1983 and May 1984, with a mean of December 1983.

Following the trial, the jury issued a special verdict finding (1) Westling had proved that the groundwater contamination arose out of a sudden and accidental release, discharge, dispersal, or escape of perc into the groundwater; (2) such event occurred after May 31, 1983 and before June 2, 1984; (3) the insurers had failed to prove that ongoing spillage or intentional dumping of perc was the overriding cause of the groundwater contamination; and (4) 1972–1975 was the first period of time in which there was "any" contamination of the groundwater by perc from the Westling site.

Based on the special verdict, the trial court concluded that Westling had proved that the groundwater contamination resulted from a sudden and accidental release of perc during the relevant policy periods, requiring the insurers to defend and indemnify Westling against the MPCA's suit. The court also found that the insurers did not prove that other, ongoing spillage of perc was an overriding cause of the groundwater contamination.

The court denied the insurers' post-trial motions for judgment notwithstanding the verdict and/or a new trial, and the insurers appealed.

### ISSUES

1. Does the record demonstrate that the groundwater contamination was caused by a single occurrence during the coverage period and that prior and subsequent continuous contamination was not an overriding cause of the damage to the groundwater?

2. Does the record demonstrate that the single occurrence of groundwater contamination during the policy period was sudden and accidental?

### ANALYSIS

On appeal from the denial of a motion for JNOV, we must examine the facts in the light most favorable to the jurors' findings and affirm unless the evidence is "practically conclusive" against the verdict. *See Waite v. American Fam. Mut. Ins. Co.*, 352 N.W.2d

19, 21 (Minn.1984); *Sandhofer v. Abbott–N.W. Hosp.*, 283 N.W.2d 362, 365 (Minn. 1979).

### 1. Triggering of coverage.

 Coverage under the Western National and Employers Mutual policies could be triggered only if Westling showed that actual injury to the groundwater occurred during a span of time that includes the policy periods. *See NSP v. Fidelity & Cas. Co.*, 523 N.W.2d 657, 662–63 (Minn.1994) (explaining and applying the "actual injury" rule to determine whether policy provides coverage). The parties do not dispute that there was some actual injury to the groundwater over a period of years that included those during which appellants provided coverage.

 Once the occurrence of relevant damage is shown, the actual injury rule ordinarily limits an insurer's liability to those damages that occurred during the policy period. *Id.* In *NSP*, the court held that if property damage occurs over several policy periods, is continuous, and is "so intermingled as to be practically indivisible," the court should presume that the damages were continuous and allocate them to the various insurers pro rata by time on the risk. *Id.* at 664; *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 733 (Minn.1997). Under such circumstances, an insurer may avoid coverage by demonstrating that no appreciable damage occurred during a particular policy period. *NSP*, 523 N.W.2d at 664.

The facts in *NSP* involved "continuous-trigger" contamination, that is, contamination that was presumed to be continuous over a long period of time. Apparently, there was no allegation in *NSP* that the property damage was caused in part by a discrete and identifiable occurrence in a single policy period—that is, an instance of "single-trigger" contamination.

Unlike situations involving continuous-trigger contamination, if it is shown that property damage was the result of single-trigger contamination, only the policies that were on the risk in the year the damage occurred are triggered, and those insurers remain liable for all resulting damages. *See Domtar*, 563 N.W.2d at 733 (citing *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 318 (Minn. 1995)).

In *SCSC*, there was evidence of perc drippings for a period of years in small volumes, continuous contamination that invites application of the NSP allocation scheme. 536 N.W.2d at 309. But there was also testimony suggesting that on one or two occasions, a high concentration of perc had been spilled. *Id.* at 310. The court concluded that there was sufficient evidence that the damage to the groundwater was the result of a "single event," *id.* at 318, which the supreme court subsequently has described as a "discrete and identifiable" event. *Domtar*, 563 N.W.2d at 733 (contrasting these events with "those difficult cases in which property damage is both continuous and so intermingled as to be practically indivisible").

The *SCSC* court explained that coverage would not be defeated even though another, excluded cause contributed to the damage; an insured need only prove the existence of one direct, covered cause to support a claim of coverage. *SCSC*, 536 N.W.2d at 314. But the court also held that an insurer may defeat coverage by proving that another, excluded cause is an "overriding" cause of the damage. *Id.*

In the present case, the jury found that 1972–75 was the first period of time in which there was "any" contamination of the groundwater by perc originating from the Westling site. The insurers argue that this contamination should be presumed continuous, pursuant to *NSP* and *Domtar*. But, as in *SCSC*, the facts of this case do not only involve allegations of continuous, indivisible contamination. Although there is evidence of some continuous contamination as a result of perc spills near the vapor degreaser on the west side of the Westling facility, the evidence also indicates the existence of single-event contamination, caused by a discrete and identifiable spill of perc near the concrete storage pad on the southwest corner of the warehouse.[1]

---

1. In *Domtar*, describing the breadth of its *SCSC* decision, the supreme court noted that in the

As in *SCSC*, the jury in the present case found that the contamination of the groundwater arose out of a single, identifiable release of perc. The jury found that this release occurred between May 1983 and June 1984. Furthermore, the jury found that the insurers had failed to prove that the ongoing contamination was an overriding cause of this discrete event of groundwater contamination.[2] This jury finding is tantamount to the jury finding in *SCSC* that the property damage was "neither divisible nor attributable to an overriding cause." *Id.* at 310; *see also id.* at 317 (affirming jury finding that damages were not divisible and noting no record evidence that other additions of perc increased cleanup costs caused by spill during policy period).

Viewing the facts in the light most favorable to the jury's findings, we cannot conclude that the evidence is "practically conclusive" against those findings. Testimony submitted by Westling's experts indicated that a spill in 1983–84 accounted for the bulk of the harm to the groundwater, and that prior, ongoing spillage of perc was not an overriding cause of the contamination. The experts testified that most of the perc found in the groundwater came from the concrete pad, and that spills near the vapor degreaser could not explain the substantial contamination found in the neighbor's sandpoint well because the groundwater did not flow in that direction. The evidence indicated that the groundwater was damaged as a result of a single, large slug of perc, which was later identified downstream, sampled, and measured by Westling's experts.

We note that in *Domtar*, also, there was evidence of both continuous and single-event contamination. 563 N.W.2d at 729. Unlike the facts of the present case, in *Domtar* the experts agreed that the contamination could not be apportioned among causes. *Id.* at 730. Perhaps due to this fact, the *Domtar* jury was not asked to decide whether the

dismantling process was an overriding cause of the groundwater pollution. In contrast, the jury in the present case was specifically asked to decide whether the ongoing spillage of perc was an overriding cause of the groundwater contamination. The jury found that the ongoing contamination was not an overriding cause, presenting the kind of legal question addressed in *SCSC*.

We are required in this case to make an application of law that is not clearly charted by the still-unsettled doctrines of continuous and single-event pollution, but given the verdict and findings we have before us, we find no cause to disregard the impact of *SCSC* or enlarge the doctrines of *NSP* and *Domtar*.

### 2. Sudden and accidental.

The Western National and Employers Mutual policies exclude coverage for property damage arising out of the discharge, release, or escape of contaminants or pollutants. The exclusion is not applicable if such discharge, release, or escape is "sudden and accidental." Westling had the burden of proving that the groundwater pollution was sudden and accidental. *See SCSC*, 536 N.W.2d at 314 (stating that once insurer demonstrates policy exclusion, burden shifts to insured to demonstrate applicability of exception to exclusion).

A release is "sudden" if "the incident at issue occurs relatively quickly rather than gradually over a long period of time." *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368, 375 (Minn.App.1992), *review denied* (Minn. Mar. 26, 1992). The term "sudden" "carries the temporal connotation of 'abruptness.'" *Id.* (citation omitted). Numerous discharges of contamination that occur over an ongoing period of time do not constitute "sudden" releases, even if each release, by itself, could be termed sudden. *See Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 503 N.W.2d 793, 797 (Minn.App.

earlier decision, it had upheld a single-event triggering of coverage "despite continuing damage from leaching of chemicals into the groundwater after the policy period." 563 N.W.2d at 733. SCSC does not state whether it is significant that other damage occurs before or after the identified single event, and we do not read this de-

scriptive language of *Domtar* as determinative of the rule of law.

**2.** Neither the trial court nor this court was presented with a dispute on this construction of the jury's finding.

1993) (*Sylvester Bros. II* ) (declining to examine each individual release, rather than releases' total effect, when deciding whether pattern of landfill contamination was sudden), *review denied* (Minn. Sept. 30, 1993).

The jury found that Westling had proved by a preponderance of the evidence that the groundwater contamination arose out of a sudden release, discharge, dispersal, or escape of perc into the groundwater. This finding is supported by Erdmann's testimony that a large quantity of perc suddenly entered the groundwater between July 1983 and May 1984.

The undisputed evidence in the record indicates that the latest time a spill could have occurred near the concrete pad was September 1983; after that time, barrels containing used perc were no longer stored on the concrete pad. Western National argues that if the perc entered the groundwater between December 1983 and March 1984, such entry could not have been "sudden," because it would have taken three to seven months to enter the groundwater. But in determining whether a release is "sudden," the relevant date is when the contaminant reached the groundwater and damaged the property of a third party. *Bell Lumber & Pole Co. v. United States Fire Ins. Co.*, 60 F.3d 437, 443 (8th Cir.1995). Erdmann's testimony indicated that although the slug of perc may have taken several months to travel from the concrete pad to the groundwater, the entry into and damage to the groundwater was sudden.

The insurers cite *Bell Lumber* for the proposition that the sudden and accidental exception does not apply to repeated or gradual releases over an extended period of time. But in *Bell Lumber,* the court considered releases of contaminants into the groundwater that occurred gradually over a long period of time, as a result of fifteen spills. *Id.* at 441 (noting that it was "undisputed that the release of contaminants into the subsoil and groundwater below * * * occurred gradually, over many years"). In other words, *Bell Lumber* conforms to cases on the issue of triggering of coverage for continuous, indivis-

ible contamination events. In the present case, although there evidently was some ongoing groundwater contamination from an initial release of perc in 1972–1975, that fact does not prevent a finding that another significant spill in 1983–84 contributed to a sudden and accidental entry of perc into the groundwater several months later.

Western National also argues that even if there was a spill in 1983–84, there was no evidence that the release, discharge, dispersal, or escape of perc into the groundwater was accidental, rather than intentional. Again, Westling had the burden of proof at trial. *See SCSC,* 536 N.W.2d at 314 (stating that the insured has burden of proving exception to exclusion).

Western National is correct in noting that the relevant question is whether the release into the groundwater was accidental. *See Domtar,* 563 N.W.2d at 735–36. Yet, the courts cannot determine this question without examining Westling's actions on the surface that precipitated the spill of perc from its containment on the storage pad. There was no testimony by any witness who actually knew of an accidental or intentional spill of perc in the location of the concrete storage pad in 1983–84. To the contrary, witnesses testified that they did not know of any spill of perc that could have caused the contamination in the Airway Products well. Without evidence of any intentional spills on the surface, the jury had no evidence to warrant a finding that a release of perc into the groundwater in 1983–84 was intentional.[3]

Western National contends that it was equally conjectural for the jury to find that the contamination occurred accidentally. But the trial court instructed the jury that an "accident" is an unexpected, unforeseen, or undesigned happening or consequence from either a "known or unknown cause." The insurers did not object to this instruction, and the instruction permits the insured to show what is unknown to meet its burden of proof of what is accidental. Also, there is merit in the trial court's finding that, because there was no evidence of an intentional spill

---

3. Our analysis of this issue is confined to the 1983–84 discharge, rendering insignificant any question about whether other ongoing pollution was or was not accidental.

at the location of the concrete pad, "by process of elimination, the circumstantial evidence supports the * * * possibility that the event was an accident, an unexpected, unfor[e]seen, or undesigned happening or consequence." As the court noted, there was also evidence that known spills, before the events of 1983–84, had been accidental in nature.

**Additional issues.**

 (a) A Request for Investigation issued by the MPCA is a "suit" triggering an insurer's duty to defend. *SCSC*, 536 N.W.2d at 315. An insurer's duty to defend a suit exists if any claim is "arguably" covered by the policy. *Brown v. State Auto. & Cas. Underwriters*, 293 N.W.2d 822, 825 (Minn. 1980).

 Western National argues that it had no duty to defend because, when Westling tendered defense of the action, it did not claim that there had been a "sudden and accidental" release of contaminants into the groundwater.

In *SCSC*, the court found a duty to defend where, after tender, the insurer, having failed to investigate the facts of the case, also failed to advise the insured that the pollution exclusion barred coverage, limiting the insured's opportunity to provide the insurer with further information. 536 N.W.2d at 316 n. 3. Here, Western National expressly notified Westling that it believed coverage was barred by the pollution exclusion. And prior to the summary judgment hearing, Westling did not produce evidence that the pollution was sudden and accidental.

Notwithstanding the circumstances that distinguish this case from *SCSC*, we conclude that coverage was "arguable" until further investigation of the facts revealed that the exception to the exclusion was inapplicable. Given a serious claim that cannot be established without unusually difficult and expensive investigative efforts, there is no authority for the proposition that tender of the claim must await completion of an ongoing investigation of facts such that all conditions of coverage are made evident. We are mindful in resolving this issue of the insurer's burden to establish the applicability of its exclusions and of partiality in the law for the insured on the issue of the insurer's duty to defend. *Caledonia Community Hosp. v. St. Paul Fire & Marine Ins. Co.*, 307 Minn. 352, 354, 239 N.W.2d 768, 770 (1976) (stating that insurer who asserts coverage exclusion has burden of establishing that exclusion is applicable); *Prahm v. Rupp Const. Co.*, 277 N.W.2d 389, 390 (Minn.1979) (stating that insurer seeking to avoid defending insured has burden of demonstrating that all parts of cause of action against insured clearly fall outside scope of coverage); *John Deere Ins. Co. v. Shamrock Industries Inc.*, 929 F.2d 413, 418 (8th Cir.1991) (citing Minnesota law for proposition that when determining whether insurer has duty to defend, court must give benefit of doubt to insured).

 (b) Western National also argues that it had no duty to pay Westling's defense costs because it was not notified of the MPCA's action until after Westling had responded to the Response for Investigation, the MPCA had threatened to issue a Request for Response Action, and Westling had agreed to cooperate with the MPCA.

In *Domtar*, the supreme court concluded that costs incurred by the insured to investigate and comply with a Request for Response Action are defense costs, not merely an item of its claim for indemnity, when the insured has incurred the costs in an attempt "to avoid or at least minimize the cost of the remediation." 563 N.W.2d at 738. The *Domtar* court explained: "the fact that otherwise allowable defense costs serve the dual purpose of complying with the RFRA does not, in our estimation, render such costs indemnity costs." *Id.*

Similarly, we conclude that the investigation and compliance costs incurred by Westling after responding to the Request for Investigation must be considered defense costs. The trial court correctly determined that Westling was entitled to recover its defense costs incurred after July 7, 1992, the date of tender. *See id.* at 739 (cautioning that defense costs are not recoverable from insurer until defense is properly tendered).

 (c) The jury, by special verdict, found that Westling had expended $1,085,626

for remedial investigation, feasibility studies, response to MPCA requests, and remediation of groundwater contamination. Of that amount, the jury allocated $775,718 as defense costs incurred after July 7, 1992, the date of tender. The trial court adopted this allocation.

Western National claims that there is no evidence in the record that supports the jury's allocation of defense costs. Although the exhibits did not distinguish between defense and remediation expenses, Paul Josephson testified that the ratio of defense expenses to remediation expenses was five-to-one.[4]

The trial court concluded that if the jury had added up the amounts provided in the exhibits and applied a five-to-one ratio, the jury could have properly arrived at a figure roughly equivalent to $775,718 in defense costs incurred after July 7, 1992. This conclusion is supported by the evidence in the record.

(d) The trial court granted Westling's request for reimbursement of the attorney fees and costs it had incurred in the present declaratory judgment action to establish Western National's duty to defend. An insured may recover from an insurer "damages resulting from breach of contract by the insurer's failure to defend." *American Std. Ins. Co. v. Le*, 551 N.W.2d 923, 926 (Minn.1996). Appellate review of an award of fees and costs is limited to an abuse of discretion standard. *Domtar*, 563 N.W.2d at 740.

In a prior summary judgment order, the trial court determined that Western National had a duty to defend Westling against the MPCA's demands. Western National argues that Westling was not entitled to any litigation costs incurred after the summary judgment order was issued, because the later costs were incurred to determine the costs of indemnification, as well as the costs incurred in establishing the duty to defend. But the costs incurred by Westling in pursuing the present declaratory judgment action against the insurers were incurred as a result of Western National's original breach of its duty to defend.

It is determinative, we conclude, that Western National made no attempt to pay for Westling's investigation and remediation expenses upon a determination of its duty to defend. Moreover, if Western National had defended Westling against an action by the MPCA to recover its investigation and remediation costs, Western would have been required to assume the litigation costs in that action; because the present action resolves the underlying issues, it is proper that Western National pay Westling's costs. The trial court did not abuse its discretion by awarding Westling its attorney fees and costs incurred throughout this action.

(e) Western National also summarily challenges, as excessive, the amount that the trial court awarded to Westling as reimbursement for technical support provided by Wenck during trial. Western also urges that the bulk of such services was related to the duty to indemnify and therefore should be overturned for the reasons already discussed.

The trial court concluded that because of the "highly technical nature of much of the evidence in this case," the presence of Wenck employees at depositions and trial was reasonable and necessary. Western National has not explained how this award constituted an abuse of the court's discretion. *See id.* (stating that appellate review of award of fees and costs is limited to abuse of discretion standard).

4. The fact that the exhibit to which Josephson referred was excluded from the record does not render improper any reliance on his testimony. His testimony was offered in response to questioning by Western National's counsel on voir dire, concerning the contents of an exhibit that Westling sought to introduce into evidence. Although the trial court ultimately sustained Western National's objection to the exhibit itself, there was no objection to Josephson's testimony, and the court did not instruct the jury to disregard that testimony. In fact, Western National's own counsel, in his final arguments, referred to this testimony. A party's failure to object to testimony at the time of trial bars this court from considering an objection to that testimony for the first time on appeal. *See Johnson v. Southern Minn. Mach. Sales, Inc.*, 460 N.W.2d 68, 72 (Minn.App.1990).

(f) The trial court concluded that Western National was liable for prejudgment interest. For the first time on appeal, Western National has objected to this award, arguing that the court could not properly award an amount exceeding the policy limits. Our review is confined to considering those issues that were presented to and considered by the district court. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988).

## DECISION

The trial court's findings of fact, premised on sustainable findings in the jury's special verdict, establish coverage appropriate for a single, discrete, and identifiable event. Evidence in the record sustains a finding that this event involved sudden contamination of groundwater. Given the undisputed presentation of the issue to the jury, there was ample evidence to sustain its finding that the event occurred accidentally. There being no merit in other assertions of error, we affirm the trial court judgment.

**Affirmed.**