# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1752

_____

Land O' Lakes, Inc.

*Plaintiff - Appellant*

v.

Employers Insurance Company of Wausau, formerly known as Employers Mutual
Liability Insurance Company of Wisconsin and Employers Insurance of Wausau A
Mutual Company; and The Travelers Indemnity Company

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 14, 2013
Filed: August 29, 2013

_____

Before SMITH, MELLOY, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Land O' Lakes, Inc. ("Land O' Lakes") sued two of its insurers, Employers Mutual Liability Insurance Company of Wausau[1] ("Wausau") and The Travelers Indemnity Company ("Travelers"), seeking payment of defense costs and indemnification under commercial general liability (CGL) policies that Wausau and Travelers (collectively, "the Insurers") issued in connection with an action that the Environmental Protection Agency (EPA) brought against Land O' Lakes under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq*. (CERCLA). The district court[2] granted summary judgment to the Insurers, concluding that (1) Minnesota's six-year statute of limitations on contract actions barred Land O' Lakes's claim that the Insurers breached their duty to defend and (2) the owned-property exclusion in the CGL policies that the Insurers issued relieved them of any duty to indemnify Land O' Lakes for the costs of the EPA-mandated cleanup. Land O' Lakes appeals, and we affirm the judgment of the district court.

## I. *Background*

Land O' Lakes, a member-owned agricultural cooperative, merged with Midland Cooperatives, Inc., ("Midland") in January 1982. Midland operated an oil refinery in Cushing, Oklahoma, from 1943 until 1977, when the facility was sold to Hudson Oil Refinery Company ("Hudson Oil"). Hudson Oil, Midland's successor, abandoned the refinery in 1982 and went bankrupt in 1984. Land O' Lakes acquired Midland in 1982, including the now dormant refinery. The EPA eventually targeted Hudson Oil in a cleanup action at the refinery site. In addition, the Oklahoma Department of Environmental Quality (ODEQ) subjected the site to ongoing

[1]Employers Insurance Company of Wausau was formerly known as Employers Mutual Liability Insurance Company of Wisconsin and Employers Insurance of Wausau A Mutual Company.

[2]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

monitoring. Hudson Oil cleaned up the refinery site for ten years, but ceased after exhausting its funds, and in 1994, the EPA released Hudson Oil from further cleanup obligations at the refinery site.

In 1998, the EPA and the ODEQ conducted a joint inspection of the refinery site and detected a number of serious problems involving the release of hazardous materials. To address these immediate threats to human health and the environment, EPA contractors began an emergency removal action in late 1998, and in July 1999, the EPA placed the refinery site on the National Priorities List, thus designating the refinery as a Superfund site under CERCLA. From 2001 to 2003, the EPA conducted a second, non-time-critical removal action to clean up additional pollution on the site.

In January 2001, the EPA sent Land O' Lakes a Special Notice Letter ("the 2001 PRP Letter"), informing Land O' Lakes that based on Midland's past ownership of the refinery site and Land O' Lakes's later acquisition of Midland, the EPA considered Land O' Lakes a Potentially Responsible Party (PRP) under CERCLA and thus potentially liable for cleanup costs at the refinery site. *See* 42 U.S.C. § 9607(a); 40 C.F.R. § 304.12(m) (defining "potentially responsible party"). Under CERCLA, a PRP may be required to pay the costs of cleaning up a Superfund site that it or its predecessors previously owned. 42 U.S.C. § 9607(a). The 2001 PRP Letter, among other things, (1) demanded that Land O' Lakes pay the roughly $8.9 million in costs already incurred by the EPA in cleaning up the refinery site in the emergency and non-time-critical actions;[3] (2) invited Land O' Lakes to enter into negotiations with the EPA for the performance of a Remedial Investigation and Feasibility Study (RI/FS) at the refinery site; and (3) provided general and refinery-site-specific information for purposes of negotiations with the agency. The EPA sent a draft

---

[3]The parties agree that the $8.9 million in removal costs attributable to the EPA's emergency and non-time-critical removal actions is not covered under the CGL policies that the Insurers issued.

Administrative Order on Consent (AOC) for conducting the RI/FS along with the 2001 PRP Letter.

In March 2001, Land O' Lakes responded to the 2001 PRP Letter by asserting that Hudson Oil, not Midland, caused any contamination at the refinery site. Thus, Land O' Lakes asserted that it bore no responsibility for the cleanup costs. Land O' Lakes also refused to pay the $8.9 million in past cleanup costs that the EPA incurred and to participate in or pay for an RI/FS.

Despite Land O' Lakes's denial of responsibility for cleanup at the refinery site, Land O' Lakes notified the Insurers of the EPA's claims and sought a defense and indemnification under various CGL policies that the Insurers issued to Land O' Lakes and Midland. In November 2001, Wausau declined to defend Land O' Lakes, concluding that the 2001 PRP Letter was not a covered "suit" under the CGL policies. Land O' Lakes challenged this determination by letter in January 2002, noting that most courts considering the issue had ruled "that the duty to defend is triggered by an EPA demand letter." Land O' Lakes contended that Wausau's actions amounted to "a declination of coverage and a breach of [Wausau's] duty to defend." For the next six years, however, Land O' Lakes took no further action to challenge Wausau's denial of defense and indemnification obligations under the policies.

Travelers also declined to defend Land O' Lakes after receiving notice of the 2001 PRP Letter. Travelers concluded that, because its CGL policies had been issued to Land O' Lakes prior to Land O' Lakes's acquisition of Midland in January 1982, those CGL policies would not provide any coverage to Midland before Land O' Lakes acquired Midland. For the next seven years, Land O' Lakes took no further action to challenge Travelers's denial of defense and indemnification obligations under the policies.

Meanwhile, without Land O' Lakes's participation, the EPA continued its cleanup activities at the refinery site, completing its non-time-critical removal action in June 2003. From 2004 to 2007, the ODEQ, on behalf of the EPA, completed an RI/FS that outlined the contamination on the site and proposed alternatives to finally complete the cleanup. In November 2007, the EPA issued a Record of Decision (ROD) in which it selected an approach to completing the cleanup of the site. The ROD described the history of activities on the site, evaluated the contamination found at the site, listed and compared the alternative approaches for remedying the contamination, and ultimately selected a remedy to "treat[] and/or remove[] the source materials constituting principal threats at the site." The ROD estimated that the selected remedy would cost $9.65 million.

The EPA sent Land O' Lakes a second Special Notice Letter in February 2008 ("the 2008 PRP Letter"), inviting Land O' Lakes to enter negotiations regarding the continued cleanup activities at the refinery site. The EPA also demanded that Land O' Lakes reimburse it for approximately $21 million in prior cleanup expenditures at the site. Included with the 2008 PRP Letter was a draft consent decree and a draft Remedial Design/Remedial Action plan (RD/RA) for implementing the cleanup remedy the EPA had earlier selected in the ROD.

In May 2008, Land O' Lakes responded to the EPA by reiterating its earlier denial. It contended that Midland had caused any contamination at the site, refused to reimburse the EPA for past cleanup costs, and declined to participate in or pay for any future cleanup activities. Land O' Lakes notified the Insurers of the 2008 PRP Letter, and it again asked for a defense and indemnification. The Insurers again denied that they had any obligation to defend or indemnify Land O' Lakes in connection with the cleanup of the refinery site.

In January 2009, the EPA rejected Land O' Lakes's denial of responsibility for remediation at the refinery site and issued a Unilateral Administrative Order (UAO),

directing Land O' Lakes to implement the cleanup remedy the EPA had selected in the ROD. The UAO ordered Land O' Lakes to "perform a remedial design for the remedy described in the [ROD]" and to "implement the design by performing a remedial action." In February 2009, shortly after receiving the UAO, Land O' Lakes informed the EPA that it would comply with the agency's directives regarding the refinery site. Although Land O' Lakes objected to several details, it initiated the cleanup activities dictated in the UAO. Land O' Lakes hired contractors to implement the selected remedy, and in November 2010, the EPA issued a report indicating that the site had been cleaned up in accordance with the ROD. At present, the remediation is largely complete. The site will, however, remain subject to periodic inspections by the EPA or the ODEQ.

After initiating its cleanup efforts, Land O' Lakes filed a breach-of-contract action against the Insurers. Land O' Lakes demanded reimbursement of the costs it had incurred in defending the EPA action and a declaration that the Insurers were required to indemnify Land O' Lakes for its costs in cleaning up the refinery site. The Insurers moved for summary judgment, which the district court granted. With respect to Land O' Lakes's duty-to-defend claim, the court concluded that (1) the EPA's 2001 PRP Letter was a suit for arguably-covered damages under the relevant CGL policies; (2) the Insurers' refusal in 2001 to defend against the EPA's suit constituted a breach of their duty to defend under the respective CGL policies; (3) this breach triggered the six-year limitations period on contract actions under Minnesota law;[4] and (4) because Land O' Lakes did not file its lawsuit against the Insurers until 2009, the duty-to-defend claim was untimely. With respect to Land O' Lakes's duty-to-indemnify claim, the court concluded that the owned-property exclusion in the CGL

---

[4]None of the parties challenge the district court's determination that Minnesota's six-year statute of limitations applies to Land O' Lakes's claim that the Insurers breached their duty to defend. *See* Minn. Stat. § 541.05, subd. 1(1) (establishing a six-year limitations period for contract actions).

policies at issue precluded coverage for Land O' Lakes's costs to comply with the EPA-mandated cleanup.

## II. *Discussion*

In this appeal, Land O' Lakes argues that the 2008 PRP Letter constitutes a "suit," but the 2001 PRP Letter was not a "suit"—and, thus, the Minnesota statute of limitations does not bar its claims. It contends that the 2001 and 2008 letters were distinct claims and have separate accrual dates as it relates to the statute of limitations. Land O' Lakes also argues that the owned property exclusions to its insurance policies are inapplicable because the refinery cleanup was conducted to address an existing threat. We review de novo a district court's interpretation of an insurance contract and its decision to grant summary judgment. *Face, Festivals & Concert Events, Inc. v. Scottsdale Ins. Co.*, 632 F.3d 417, 419 (8th Cir. 2011).

## A. *Effect of 2001 PRP Letter*

Land O' Lakes first argues that the district court erred in holding that the 2001 PRP Letter triggered the Insurers' duty to defend and thus that Minnesota's six-year statute of limitations on contract actions barred Land O' Lakes's claims. An insurer's duty to defend is generally determined based on the allegations in the underlying complaint, and the duty extends to every claim that arguably falls within the scope of coverage provided under the relevant insurance policy. *Wooddale Builders, Inc. v. Md. Cas. Co.*, 722 N.W.2d 283, 302 (Minn. 2006). This is true regardless of the merits of the claims asserted. *Id.* Land O' Lakes argues that the 2001 PRP Letter did not trigger the Insurers' duty to defend because the 2001 PRP Letter was not a "'suit' seeking damages because of 'property damage,'" as the CGL policies define those terms. In other words, according to Land O' Lakes, the 2001 PRP Letter was not a suit for arguably-covered damages. Rather, according to Land O' Lakes, the 2001 PRP Letter was nothing more than an "invitation to participate in an investigation" into whether remediation would be necessary at the refinery site. We disagree.

The district court applied Minnesota choice of law rules to determine whether Minnesota or Oklahoma law governed the insurance contract. The court determined that Minnesota law applied to the Travelers Insurance policy because Travelers issued the policy before Land O' Lakes acquired the Oklahoma refinery. Also, the court determined that Oklahoma law applied to the Wausau policy because Wausau issued it specifically to cover the refinery. The Minnesota Supreme Court has concluded that a PRP letter is a "suit" as that term is used in various CGL policies. *See SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 315 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 1995). The Oklahoma Supreme Court has not yet addressed the issue. Based on its assessment, the district court determined that the Oklahoma Supreme Court would rule consistent with Minnesota. *Land O' Lakes, Inc. v. Emp'rs Mut. Liab. Ins. Co. of Wis.*, 846 F. Supp. 2d 1007, 1019–22 (D. Minn. 2012). Neither Land O' Lakes nor the Insurers contest this determination on appeal, and we therefore adopt the district court's conclusion. *See Hallquist v. United Home Loans, Inc.*, 715 F.3d 1040, 1046 (8th Cir. 2013) ("Claims not raised in an opening brief are deemed waived." (Quotations and citations omitted)).

Land O' Lakes takes issue with the district court's conclusion that the 2001 PRP Letter was a "suit" for arguably-covered damages for purposes of the CGL policies that the Insurers issued. But contrary to Land O' Lakes's characterization of the 2001 PRP Letter, it was not simply an invitation to participate in an investigation. The 2001 PRP Letter marked the beginning of an adversarial administrative process that ultimately sought to impose liability upon Land O' Lakes for remediation costs associated with the refinery site. The 2001 PRP Letter served purposes in addition to requesting Land O' Lakes's voluntary participation. Specifically, the 2001 PRP letter: (1) notified Land O' Lakes of its "potential liability under CERCLA . . . with respect to" the refinery site; (2) informed Land O' Lakes that a "60-day formal negotiation period" would commence upon Land O' Lakes's receipt of the Letter; (3) asked Land O' Lakes "to participate in formal negotiations" toward a settlement and future

response actions at the refinery site, including an RI/FS to determine the nature and extent of the contamination and an RD/RA to design and implement the EPA's selected remedy; (4) advised Land O' Lakes that it was "potentially liable for" the payment of necessary future investigation, remediation, and maintenance costs; and (5) warned Land O' Lakes that if it did not agree to perform or finance the necessary actions after good-faith negotiations, the EPA would commence cleanup and issue an administrative order or pursue civil litigation for reimbursement of its costs. The 2001 PRP Letter also cautioned that failure to comply could result in fines under CERCLA of up to $27,500 per day or treble damages. Included with the 2001 PRP Letter was the draft AOC, which alleged that contamination originating at the refinery site had already damaged off-site property and might continue to do so. As the district court noted, the 2001 PRP Letter was "not a polite invitation from the EPA to engage in conversation." *Emp'rs Mut. Liab.*, 846 F. Supp. 2d at 1020. Taken as a whole, the information relayed in the 2001 PRP Letter alerted Land O' Lakes that a suit for arguably-covered damages had commenced.

In fact, Land O' Lakes originally took the position that it now attempts to disavow, namely, that the 2001 PRP Letter *was* a suit for arguably-covered damages. Specifically, Land O' Lakes advised in a November 2001 letter to Wausau that "the majority rule is that the duty to defend is triggered by an EPA demand letter" and further stated that Land O' Lakes considered Wausau's determination to the contrary "a declination of coverage and a breach of [Wausau's] duty to defend." It is apparent that Land O' Lakes itself considered the 2001 PRP Letter a suit for arguably-covered damages and the Insurers' refusal to defend a breach of their duty.

Alternatively, Land O' Lakes contends that even if the 2001 PRP Letter constituted a suit, no claim for arguably-covered damages was made until the EPA sent the 2008 PRP Letter. It was that letter, according to Land O' Lakes, that required implementation of the remedy selected in the ROD and provided an estimation of the cleanup costs that marked the point at which coverage became enforceable. This

argument is unavailing. We agree with the district court that the 2008 PRP Letter was "simply a continuation of the claims made by the EPA in the 2001 PRP [L]etter." *Emp'rs Mut. Liab.*, 846 F. Supp. 2d at 1026. The 2008 PRP Letter was not, as Land O' Lakes urges, the commencement of an entirely new and distinct enforcement action that initially triggered the Insurers' duty to defend. Rather, it was another step "in a single, continuous process of EPA enforcement" related to the refinery site. *Id.* Land O' Lakes recognized as much at the time.

In sum, the 2001 PRP Letter put Land O' Lakes on notice that additional investigation that the Letter mandated might reveal injury to property that would arguably be covered by the CGL policies that the Insurers issued. It did not matter that, in 2001, no one knew the full nature and extent of the contamination at the refinery site. In other words, the EPA's allegations arguably fell within the scope of coverage provided under the CGL policies and thus triggered the Insurers' duty to defend. *Wooddale Builders, Inc.*, 722 N.W.2d at 302 (holding that the duty to defend extends to every claim that arguably falls within the scope of coverage). We agree with the district court that the Insurers breached their duty to defend in 2001 because the 2001 PRP Letter was a "suit" for arguably-covered damages as contemplated under the pertinent CGL policies and that the 2008 PRP Letter was not the commencement of an entirely new enforcement action. We, therefore, hold that Land O' Lakes's 2009 duty-to-defend claims were barred by the Minnesota statute of limitations.[5]

## B. *Owned-Property Exclusion*

Land O' Lakes next argues that the district court erred in holding that the owned-property exclusion in the CGL policies relieved the Insurers from any duty to

---

[5]Because we affirm the district court's holding that Land O' Lakes's duty-to-defend claim against Travelers was barred by the statute of limitations, we need not address Travelers's argument that the district court erred in ruling that Midland was a "named insured" under the 1965–1970 Travelers policies.

indemnify Land O' Lakes for the cleanup costs. The court based its conclusion on the fact that the costs to comply with the EPA-mandated cleanup relate solely to remediation on Land O' Lakes's property and not to remediation on property that others owned. Although claims that are even *arguably* covered under a CGL policy give rise to the duty to defend, only claims that are *actually* covered under a CGL policy give rise to the duty to indemnify. *See Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 616–17 (Minn. 2012).

The CGL policies provide, in general, that the Insurers will pay "on behalf of [Land O' Lakes] all sums which [Land O' Lakes becomes] legally obligated to pay as damages *because of . . .* property damage" to third-party property on account of a covered occurrence. The Minnesota Supreme Court has interpreted this language to mean that a causal relationship must exist between the damages for which indemnification is sought and a covered occurrence that injured third-party property. *SCSC Corp.*, 536 N.W.2d at 311–12; *Minn. Mining and Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 182, 184 (Minn. 1990) ("*3M*") (holding that cleanup costs may be "damages" under an insurance policy if the damages "are causally related to covered 'property damage'").

The CGL policies also provide that the Insurers will *not* pay for damages to Land O' Lakes's *own* property—the so-called owned-property exclusion. Under Minnesota law, the owned-property exclusion precludes coverage for costs incurred by an insured to remediate contamination that is "confined to the insured's property and unrelated to preventing off-site contamination." *Domtar Inc. v. Niagra Fire Ins. Co.*, 563 N.W.2d 724, 734 (Minn. 1997). If contamination on an insured's own property has already damaged third-party property, however, government-mandated "[c]osts and expenses for the cleanup of" the contamination on both the insured's own property and third-party property may be covered. *N. States Power Co. v. Fid. & Cas. Co. of N.Y.*, 504 N.W.2d 240, 245 (Minn. Ct. App. 1993), *aff'd as modified*, 523 N.W.2d 657 (Minn. 1994). But costs and expenses to clean up the insured's own

property in order "to prevent future pollution of a type which has yet to occur or from a source which has yet to cause pollution . . . are not covered because these costs are not *causally related* to the [third-party] property damage." *Id*. (emphasis added); *see also 3M*, 457 N.W.2d at 184 (noting that the costs of "[p]urely preventative measures are not covered in the absence of property damage"). The Minnesota Supreme Court held in *Domtar* that "if there is actual injury and an existing threat to third-party property (whether private or public), then clean-up on the insured's own property that is designed to protect third-party property" may be covered despite an owned-property exclusion. 563 N.W.2d at 734.

Land O' Lakes first asserts that the district court erred in concluding that it failed to show that third-party property had been damaged by contamination from the refinery site—the "actual injury" component of the *Domtar* test. According to Land O' Lakes, any contamination of third-party property attributable to the refinery site is sufficient to satisfy the actual-injury requirement. Because the EPA-ordered cleanup did not involve any off-site contamination that would satisfy the actual-injury requirement, Land O' Lakes points to off-site contamination that occurred during Midland's 1953–1977 operation of the refinery to show the requisite third-party property damage. According to Land O' Lakes, contaminants released from the refinery damaged Skull Creek and Cimarron River in the 1970s. These waterways belonged to third parties and thus satisfied the actual-injury-to-third-party-property requirement. Land O' Lakes avers, therefore, that all the costs it must now incur to clean up the refinery site in order to prevent any future damage to any third-party property fall outside the exclusion—it is irrelevant that the third-party property actually injured in 1970 is different from the third-party property subject to an existing threat that the current cleanup is designed to protect against in the future. *See Domtar*, 563 N.W.2d at 734.

The district court provided the following helpful example to illustrate Land O' Lakes's argument. The owned-property exclusion would deny coverage to a

hypothetical insured who incurs costs to comply with a 2013 order by the EPA to repair a corroded storage tank that could leak chemicals onto and damage adjoining third-party Property X at some point in the future. The insured's costs to repair the tank would not be covered because there had been no prior contamination of the insured's own property. This is true even if the purpose of the 2013 repair is to protect third-party Property X from future damage caused by an existing threat. Assuming the same set of facts, assume further that in 1950, a pipe on the insured's property had leaked a small amount of oil onto the insured's property that seeped onto adjoining third-party Property Y. Under Land O' Lakes's theory, the cost of replacing the chemical-storage tank that threatens Property X in 2013 must now be borne by the insurer because of an actual injury to third-party Property Y in 1950—even though the 1950 oil-pipe leak onto Property Y is completely unrelated to the threatened chemical-storage-tank leak onto Property X in 2013. *See Emp'rs Mut. Liab.*, 846 F. Supp. 2d at 1032.

As the district court observed, "[t]his is a facially absurd result" that disregards the requirement under Minnesota law and the CGL policies that a causal relationship exist between the cleanup activities and the injury to third-party property. *Id.* Moreover, it impermissibly broadens the scope of coverage provided under the CGL policies. Based on the foregoing, we conclude that Land O' Lakes has failed to establish an "actual injury" to third-party property.

Land O' Lakes next argues that the district court erred in holding that it cannot satisfy *Domtar*'s existing-threat-to-third-party-property requirement with evidence of "a threat to the general environment." As explained above, *Domtar* requires both actual injury to third-party property and an existing threat to the same third-party property that the current cleanup is designed to protect. Because we have already concluded that Land O' Lakes has failed to establish an actual injury to third-party property as required under *Domtar*, we need not address Land O' Lakes's assertions of error in the district court's determination that Land O' Lakes failed to show an

existing threat to third-party property. In any event, we agree with the district court that Land O' Lakes cannot establish an existing threat to third-party property sufficient to overcome the application of the owned-property exclusion by merely adducing evidence of a threat to the environment in general.

Land O' Lakes argues that the district court's ruling cannot be reconciled with this court's opinion in *Continental Insurance Companies v. Northeastern. Pharmaceutical & Chemical Company*, 811 F.2d 1180 (8th Cir. 1987).[6] Land O' Lakes contends that *Continental* stands for the proposition that because a state or federal government suffers actual "property damage" when the land, water, or air in its particular jurisdiction is contaminated, damage to the environment in general is "property damage" to third-party property. It follows, according to Land O' Lakes, that "if actual damage to the general environment constitutes 'property damage'" to third-party property, "then a threat [of damage] to the general environment" must also constitute a threat of damage to third-party property. Assuming for the sake of argument that *Cont'l Ins. Cos.*, which applied Missouri law, has any bearing on this case, Land O' Lakes's interpretation of *Cont'l Ins. Cos.* overstates the scope of the decision. In *Cont'l Ins. Cos.*, the court considered whether "the improper release of toxic wastes may cause property damage not only to the actual owner of the land, water, or air, but also to state and federal governments because of their interest independent of and behind the titles of its citizens in all the earth and air within their domain." *Cont'l Ins. Cos.*, 811 F.2d at 1187 (quotations, alteration, and citation omitted). Just because a state or the federal government may possess some theoretical

---

[6]We note that the panel opinion upon which Land O' Lakes relies was vacated by our court en banc. *See Continental Insurance Companies v. Northeastern Pharmaceutical & Chemical Company, Inc., et. al.*, 842 F.2d 977 (1988) (en banc). Subsequently, the Missouri Supreme Court expressly repudiated a portion of our en banc court's statement of Missouri law concluding that our decision "misconstrues and circumvents Missouri law" with respect to defining damages. *See Farmland Indus. v. Republic Ins. Co.*, 941 S.W. 2d 505, 510 ( Mo. 1997) (en banc).

interest in an insured's property does not mean that the property is not owned by the insured for purposes of insurance contract interpretation. As the district court noted, if third-party property under the CGL policies included the "environment" in general, the owned-property exclusion would be "vitiate[d] . . . because every blade of grass on every plot of land is both the property of the land's owner *and* a part of the 'environment.'" *Emp'rs Mut. Liab.*, 846 F. Supp. 2d at 1035. Land O' Lakes cannot satisfy *Domtar*'s existing-threat-to-third-party-property requirement with evidence of damage only to the general environment, and the district court did not err in so holding.

We agree with the district court's conclusion that Land O' Lakes's costs to remediate the refinery site fall within the owned-property exclusion because Land O' Lakes has not established that (1) third-party property had been contaminated by hazardous materials from the refinery site; (2) that same third-party property remained contaminated at the time the EPA ordered Land O' Lakes to clean up the refinery site; (3) the hazardous materials from the refinery site posed a continuing threat of contamination to that same third-party property; and (4) the EPA-mandated cleanup of the refinery site was designed to protect that same piece of third-party property from further contamination by hazardous materials from the refinery site.

III. *Conclusion*

For the foregoing reasons, we affirm the judgment of the district court.

_____