# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3699

_____

Busch Properties, Inc.

*Plaintiff - Appellant*

v.

National Union Fire Insurance Company of Pittsburgh, PA.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 24, 2015
Filed: February 24, 2016

_____

Before MURPHY, MELLOY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Busch Properties, Inc. ("Busch") sued National Union Fire Insurance Company ("National Union") after National Union denied coverage for Busch's expenditures to remediate mold in the Kingsmill Resort condominium complex that it managed. National Union denied coverage because it concluded that Busch had not become legally obligated to make the repairs. This case requires us to determine, under

Missouri law, whether National Union could lawfully deny coverage under the policies that provide coverage if Busch "become[s] legally obligated to pay as damages for liability imposed upon the Insured by law," "becomes legally obligated to pay by reason of liability imposed by law," or incurs "liability assumed by the Insured under contract." The district court[1] concluded that there was no coverage for the remediation payments. Busch appeals, arguing that National Union should pay the cost of mold removal. We affirm.

## I. *Background*

The Kingsmill Resort condominiums are located near Williamsburg, Virginia. Although the condominiums are privately owned, Busch acts as property manager and rental agent for the condominium owners. Busch's management duties arise from two contracts: the first with each unit owner and the second with each condominium association. Under these agreements, Busch is obligated to pay for all required labor and materials in the upkeep of the complex. In return, Busch receives a large portion of the rental revenues.

As property manager, Busch installed vinyl wallpaper in the units. Unfortunately, in the early 2000s, it became apparent that vinyl wallpaper, like that used by Busch, trapped moisture inside walls, providing a fertile environment for mold. The Kingsmill Resort was no exception. Busch employees discovered mold in mid-2003, and by October of that year, Busch concluded that the entire resort required remediation.

Busch immediately notified unit owners of its findings and set out a plan whereby Busch would close the resort and remediate the mold at its own expense. The remediation project required Busch to empty the units of all personal property,

---

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

remove or clean all affected building materials, and restore the units to a livable condition. Given the scale of the project and its certain inconvenience to the property owners, Busch sought express consent from unit owners to proceed as planned. Busch drafted a consent form, which it distributed to the owners. The consent form acknowledged that Busch would pay the entire cost for the mold abatement and property repair. But it also provided that Busch admitted no liability for the presence of the mold and was not required to proceed with the remediation if it chose not to. The consent form did not purport to release any claims that unit owners may have had against Busch.

Prior to the mold discovery, Busch began renovating the complex. The updated units could be rented out at a higher rate and would thus provide more rental revenue. When Busch determined that the entire resort required remediation, it concluded that the post-abatement rebuild provided a logical opportunity to update the units during the process. Busch therefore sought financial contribution from unit owners to update their units. Busch asked owners for the additional financial contribution required in the consent form.

Busch received each owner's consent based on the consent form and decided to proceed. While two unit owners and a condominium association had expressed some concerns, no one asserted any claims or filed any lawsuits against Busch. Thus, apart from the consent form, Busch did not enter into any agreements with unit owners or condominium associations to settle the matter and proceed. Busch began remediation by November 25, 2003, and it was substantially completed by June or July of 2004.

After the remediation project was underway, Busch notified National Union, its umbrella liability insurance carrier, that it had discovered the mold and had begun remediation at its own expense. National Union had issued two general commercial liability policies to Busch, one covering the period from September 1, 1994, to July

1, 2003, and another covering the period from July 1, 2003, to July 1, 2004. After a long-delayed investigation, in June 2008, National Union questioned whether its policies covered the remediation undertaken by Busch. National Union sent Busch a letter that explained that National Union did not have evidence that Busch was legally obligated to pay damages or had incurred liability imposed by law in connection with the mold remediation, as was required by both policies. Busch filed this suit in December 2012, claiming breach of contract and vexatious refusal to pay.

The district court granted summary judgment to National Union, finding that "[w]ithout a settled claim or a settlement or judgment arising from a lawsuit, [Busch] cannot show it was 'legally obligated to pay by reason of liability imposed by law.' As a result, there is no coverage under the insurance policies." Additionally, it found that Busch's promise to remediate in the consent form did not trigger coverage under the policy language "'liability assumed by the Insured by contract'" because "[t]he Consent, which was submitted to the owners, expressly stated it did not obligate [Busch] to remediate the mold, did not constitute an acknowledgment or admission of liability, and did not include a release or settlement of any potential claim the property owner might have against [Busch]." Finally, it found that "[Busch] has not presented any evidence in support of its claim of equitable estoppel." Busch appeals.

## II. *Discussion*

On appeal, Busch argues that the district court erred in granting summary judgment on the breach-of-contract claim because it had a legal obligation imposed by law and, in the alternative, that it had assumed liability under contract.

### A. *Standard of Review*

"'We review de novo a district court's interpretation of an insurance contract and its decision to grant summary judgment.'" *Patterson v. Mut. of Omaha Ins. Co.*, 743 F.3d 1160, 1163 (8th Cir. 2014) (quoting *Land O' Lakes, Inc. v. Emp'rs Ins. Co. of Wausau*, 728 F.3d 822, 827 (8th Cir. 2013)).

-4-

## B. *Busch's Legal Obligation Was Not Imposed by Law*

There are two insurance policies at issue in this case. National Union issued the first policy in 1994. The 1994 policy obligates National Union

> [t]o pay on behalf of the Insured that portion of the ultimate net loss in excess of the retained limit as hereinafter defined, which the Insured shall *become legally obligated to pay as damages for liability imposed upon the Insured by law,* or liability assumed by the Insured under contract because of (i) personal injury, (ii) property damage, or (iii) advertising liability, as defined herein caused by an occurrence.

(Emphasis added.) In 2003, National Union issued the second policy to Busch. The 2003 policy provided,

> We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured *becomes legally obligated to pay by reason of liability imposed by law* or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world.

(Emphasis added.) The phrase "become legally obligated to pay as damages for liability imposed upon the Insured by law" and its successor phrase "becomes legally obligated to pay by reason of liability imposed by law" are the focus of this case. The district court held that the words "legally obligated" required Busch to bring forward either a settlement agreement or a court judgment. Busch has appealed, arguing that "National Union's policy language *nowhere* requires a settlement agreement or judgment as a condition of coverage."

The district court and both parties look to the Missouri Supreme Court's opinion in *D.R. Sherry Construction, Ltd. v. American Family Mutual Insurance Co.*, 316 S.W.3d 899 (Mo. 2010) (en banc), as controlling precedent. In that case, a

construction company, Sherry, built a house that developed serious foundation problems due to settling. *Id.* at 901–02. The purchaser of the home discovered the problem and demanded—including threatening to file a lawsuit—that Sherry repurchase the home. *Id.* at 902. Sherry repurchased the home pursuant to a settlement agreement with the purchaser. *Id.* When Sherry's insurance company refused to pay Sherry's claim, Sherry filed suit. *Id.* The insurance contract upon which Sherry filed its claim obligated the insurance company to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage.'" *Id.* at 903 (quotation omitted).

In analyzing the question of insurance coverage, the court addressed the insurer's argument that "there is no coverage because Sherry was not 'legally obligated' to repurchase the home." *Id.* at 906. First, the court noted that "[a]fter American Family informed Sherry that it would not undertake further investigation [of] the claim until the homeowners filed a lawsuit, Sherry repurchased the home pursuant to a settlement agreement." *Id.* Then the court held that "[a] settlement agreement is a contract that creates legally enforceable obligations. Because of the settlement agreement, Sherry legally was obligated to pay damages to the homeowners." *Id.*

Below, the district court construed *Sherry* to hold that "Missouri law . . . recognizes a claim and a settlement agreement as sufficient to establish that an insured is 'legally obligated to pay damages.'" We agree. But Busch has not asserted the existence of a settlement agreement in this case. The question thus arises whether Busch's obligations to the unit owners and condominium associations constitute a "legal obligation to pay" "as damages for liability imposed upon the Insured by law" or "by reason of liability imposed by law" as required by the insurance policies at issue. The district court concluded that Busch was, at a minimum, required to present a settlement agreement to trigger coverage.

On appeal, Busch argues that "coverage exists because it undertook remediation efforts based upon its existing legal obligations sounding in contract and tort" and that "[t]he fact that these obligations were not reduced to a settlement agreement or judgment rendered them no less obligatory or enforceable." In short, Busch asserts that "[w]hat matters is not the form of settlement or judgment but rather whether Busch Properties faced liability to unit owners and the associations 'for the damage it caused.'" We need not resolve this interesting question of Missouri law, however, because Busch cannot satisfy even the standard that it advances. Busch asserts that it had—and fulfilled—a preexisting legal obligation when it initiated the mold remediation. If Busch acted to satisfy a preexisting contractual duty, then its remediation efforts did not truly spring from "liability imposed by law" but from a duty it voluntarily assumed.

Both insurance policies limit coverage to legal obligations based upon "liability *imposed* by law." (Emphasis added.) This phrase suggests that the insured's legal obligation has been placed upon it not by assent but by declaration of law. *See Impose*, Black's Law Dictionary (10th ed. 2014) (defining "impose" as "[t]o levy or exact (a tax or duty)"); *Impose*, Merriam-Webster's Collegiate Dictionary (11th ed. 2012) (including the definitions "to establish or apply by authority" such as "a tax," "new restrictions," or "penalties" and "to establish or bring about as if by force"). Tort liability exemplifies a legal obligation that is "imposed by law." *Tort*, Black's Law Dictionary (10th ed. 2014) (including the definition "[a] civil wrong, other than breach of contract, for which a remedy may be obtained, [usually] in the form of damages; a breach of a duty that the law imposes on persons who stand in a particular relation to one another"); *Tortious Liability*, Black's Law Dictionary (10th ed. 2014) (including the definition "[l]iability that arises from the breach of a duty that (1) is fixed by the law"). And an involuntary legal obligation may be manifest in a judgment or voluntarily recognized in a settlement agreement. *See D.R. Sherry*, 316 S.W.3d at 906.

In contrast, other forms of legal obligation are not imposed by law; instead, they are voluntarily incurred and recognized by law, such as a contract. *Contract*, Black's Law Dictionary (10th ed. 2014) (including the definitions "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law" and "[b]roadly, any legal duty . . . not imposed by the law of tort"). As the First Circuit has observed, to hold otherwise would convert a commercial liability insurance policy into a contract performance bond. *See Lopez & Medina Corp. v. Marsh USA, Inc.*, 667 F.3d 58, 65–70 (1st Cir. 2012) (surveying case law from several circuit and district courts, along with insurance treatises, and concluding that "the phrase, 'legally obligated to pay as damages,' in a CGL provision . . . applies to tort and not contractual liability"). Thus, because Busch's asserted legal obligation was not "liability imposed by law," it is not covered under either insurance policy.

In this case, before the discovery of the mold, Busch secured two classes of contractual agreements that obligated it to maintain the resort in exchange for a substantial portion of rental revenues. First, the rental agreement between Busch and each unit owner required Busch "to provide maintenance services . . . including labor, parts and materials." Indeed, as Busch's president testified, "[e]verything that had to do with the maintenance of the interior of the condominium units was managed by Busch Properties," including cleaning mold found within the units and replacing the wallcovering." Thus, when Busch discovered extensive mold-related property damage affecting almost every unit in the resort, it could not turn a blind eye because "Busch Properties was the responsible party for the units.'"

Second, as Busch admits, it "had an independent contractual obligation to maintain the resort's common areas under an enforceable, oral agreement to serve as property manager for the condominium associations." The common areas included "all spaces except for the condominium interiors," including the HVAC system, attics, crawl spaces, interior of shared walls, exterior siding, roofs, awnings, and sidewalks.

Thus, Busch concedes that when it discovered significant property damage to the common areas, including the HVAC system, attics, crawlspaces, and inside of the walls, it "was legally required to fulfill its maintenance obligations or otherwise face liability for breach." In short, pursuant to maintenance agreements with the unit owners and the condominium associations, Busch has asserted that it had a preexisting obligation to remediate the mold that it discovered.

Busch's actions in this case confirm that it considered itself obligated to remediate the mold under its existing maintenance contracts. When Busch discovered the mold, it immediately developed a plan to completely pay for mold remediation. Busch rolled the mold removal into the renovation project that was already underway. For instance, Busch secured additional, express consent from the unit owners for Busch's specific mold remediation and renovation plan. Although the consent form disclaimed Busch's liability for mold removal, it clearly promised to completely pay for the remediation in its renovation process. Busch's actions are thus consistent with its understanding that it had a preexisting legal obligation to remove the mold pursuant to its maintenance agreements.

In sum, the district court correctly concluded that Busch's payments for mold remediation are not covered under its policy with National Union because its legal obligation to remediate the mold did not spring from "liability imposed by law."[2]

### C. *Busch Did Not Assume Liability Under Contract*

The 1994 insurance policy provides coverage for sums that "the Insured shall become legally obligated to pay as damages for . . . liability assumed by the Insured under contract." Busch argues that it assumed liability within the meaning of this

_____

[2]Because our holding does not require that we decide whether Missouri law interprets the phrase "legally obligated" to require the existence of a settled claim or court judgment, we need not address Busch's argument that National Union is estopped from asserting its position on that issue.

provision, pointing to its consent agreement with unit owners and its existing maintenance agreements. National Union responds that this language provides coverage for indemnity contracts, not contracts like the maintenance or consent agreements. We agree.

We have not found any Missouri case law interpreting the meaning of this language. But we have considered similar language in the context of a coverage exclusion governed by Wisconsin law. In *Ferrell v. West Bend Mutual Insurance Co.*, 393 F.3d 786 (8th Cir. 2005), we considered a provision excluding coverage when the insured was liable "'by reason of the assumption of liability in a contract or agreement.'" *Id.* at 795 (citation omitted). We concluded that the provision "would apply only if there were a contract or agreement between [a third party and the insured] to assume liability for damages." *Id.* (*Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 79–81 (Wis. 2004)). For support, we cited *American Family*, which considered a provision excluding coverage for the "'assumption of liability in a contract or agreement.'" 673 N.W.2d at 81. In that case, the Wisconsin Supreme Court concluded that such language would only apply "where the insured has contractually assumed the liability of a third party, as in an indemnification or hold harmless agreement; it does not operate to exclude coverage for any and all liabilities to which the insured is exposed under the terms of the contracts it makes generally." *Id.*

The language at issue in this case is substantially similar to the provisions in *Ferrell* and *American Family*. Busch's 1994 policy provides coverage for payments made "as damages for . . . liability assumed by the Insured under contract." Indeed, all three provisions include variations of the central operative words: *liability*, *assumed*, and *contract*. And while *Ferrell* and *American Family* dealt with provisions that excluded coverage and the provision at issue here provides coverage, each provision uses similar language to define the kind of liability excluded or covered. In the absence of other interpretive guidance from Missouri case law, *Ferrell* and

-10-

*American Family* are helpful in understanding the kind of liability covered by the provision at issue here.

We therefore conclude that the 1994 policy provides coverage in the context of an indemnification or hold harmless agreement; it is not a wholesale adoption by National Union of Busch's contract liability. Busch has not asserted the existence of any indemnification or hold harmless contract. Accordingly, the district court correctly concluded that Busch's maintenance or consent agreements do not trigger coverage under the 1994 policy because those agreements do not constitute a legal obligation to pay as damages for liability assumed by Busch under contract.

III. *Conclusion*

Accordingly, we affirm the final judgment of the district court.

_____