# United States Court of Appeals

### For the Eighth Circuit

———————————————

No. 16-1223

———————————————

The Gap, Inc.

*Plaintiff - Appellee*

v.

GK Development, Inc.; Columbia Grand Forks, LLC

*Defendants - Appellants*

——————————

Appeal from United States District Court
for the District of North Dakota - Fargo

——————————

Submitted: October 19, 2016
Filed: December 8, 2016

——————————

Before RILEY, Chief Judge, WOLLMAN, and BENTON, Circuit Judges.

——————————

BENTON, Circuit Judge.

This case addresses the meaning of a lease for a Gap store at Columbia Mall in Grand Forks, North Dakota. The Gap, Inc., says the lease does not require it to pay for heating, ventilation, and air conditioning (HVAC) expenses and a share of mall operation costs. The mall's management company, GK Development, Inc., and

owner, Columbia Grand Forks, LLC, (collectively "GK") disagree. The district court[1] agreed with Gap, declaring that it has no obligation to pay for HVAC or common area maintenance expenses. Having jurisdiction under 28 U.S.C. § 1291, this court affirms, but modifies the declaratory judgment.

I.

On April 20, 2001, Gap agreed to a written lease with then-landlord Metropolitan Life Insurance Company (MetLife) for premises at Columbia Mall. Based on a lease for another mall, the final agreement has many insertions and strike-throughs. It begins by describing "Basic Provisions," including Gap's rent obligations and the duration of the lease (five years, with options to extend for two more five-year terms). The lease later describes obligations for "Center Expenses" (costs associated with mall operation), "Utilities Provided By Landlord," and "HVAC Maintenance."

Gap opened its Columbia Mall store in July 2001. MetLife sold the mall a few years later. GK Development became property manager in 2004. Columbia Grand Forks became the owner in 2005. Gap extended the lease twice, in 2006 and 2011.

The mall provides HVAC service for all its stores by HVAC units on the mall's roof. For the first ten years of the lease, Gap was not charged (and did not pay) for HVAC or Center Expenses. In June 2011, GK sent Gap a bill for HVAC and "common area maintenance" ("CAM") expenses. GK said its previous failure to charge for these expenses was an "oversight." Gap paid this bill and other bills for HVAC and CAM expenses for 2010, 2011, 2012, and part of 2013. In 2013, Gap objected, telling GK it would stop paying, and requesting return of the payments. GK continued to demand payment.

---

[1]The Honorable Ralph R. Erickson, District Judge, United States District Court for the District of North Dakota.

In January 2014, Gap sued GK for damages and a declaratory judgment that it has no obligation to pay for HVAC or CAM expenses. GK counterclaimed for damages and a declaratory judgment that the lease obligates Gap to "pay the Tenant's Share of Common Expenses which includes the Tenant's Share of the common area maintenance and HVAC expenses." On cross-motions for summary judgment, the district court granted summary judgment to Gap. Applying North Dakota law, it ruled that the lease is unambiguous and does not require Gap to pay HVAC or CAM expenses. It also said that even if the lease were ambiguous, extrinsic evidence shows that Gap owes no HVAC or CAM payments. It ruled that GK had breached the lease, that "Gap has no obligation to pay CAM expenses or HVAC expenses for the duration of the Lease," and that GK owed Gap damages.

## II.

GK argues that the district court erred in granting summary judgment to Gap because the lease unambiguously requires Gap to pay for HVAC and Center Expenses. This court reviews de novo the district court's grant of summary judgment and its interpretation of the lease. ***Busch Props., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.***, 815 F.3d 1123, 1126 (8th Cir. 2016).

Under North Dakota law, the rules of contract interpretation apply to leases. ***Savre v. Santoyo***, 865 N.W.2d 419, 424 (N.D. 2015). The lease is interpreted "to give effect to the parties' mutual intention" when it was executed. ***Id.***, *citing* **N.D. Cent. Code § 9-07-03**. The court first tries to figure out the parties' intent by looking only at the lease's language. ***Id.***, *citing* **§ 9-07-04**. The court considers the entire lease. ***Id.*** If the court figures out the parties' intent based only on the lease's language, the interpretation of the lease is a question of law. ***Id.***

However, if the lease's language is ambiguous, the court may look to extrinsic evidence for the parties' intent. ***Olander v. State Farm Mut. Auto. Ins. Co.***, 317 F.3d

807, 809 (8th Cir. 2003) (en banc), *citing **Des Lacs Valley Land Corp. v. Herzig***, 621 N.W.2d 860, 863 (N.D. 2001). "A contract is ambiguous when rational arguments can be made for different positions about its meaning. . . . When a contract is ambiguous, the terms of the contract and the parties' intent become questions of fact." **Id.**, *quoting **Kaler v. Kraemer***, 603 N.W.2d 698, 702 (N.D. 1999).

## A.

GK argues that Article 10(B) of the lease requires Gap to pay for HVAC services provided by GK. Article 10(B) says:

> Landlord reserves the right from time to time to provide any or all utilities to the Premises. In such case, Tenant shall pay such charges as Landlord may establish from time to time, which Landlord shall determine based on the quantity of utilities used or consumed at the Premises on a monthly or other regular basis. Such charges shall be based upon Tenant's consumption and [(i)] shall not be in excess of the rate that Tenant would be charged directly by the utility company serving the general area in which the Center is located, (ii) if the Premises are separately metered for such utilities, Tenant shall pay for amounts of such utilities based on such meters, and (iii) if the Premises are not separately metered for such utilities, Tenant shall pay for amounts of such utilities based on the reasonable estimates of Landlord's engineer or consultant . . . . If no such charges are established by Landlord, then the cost of such utilities shall be included as part of Center Expenses.

Article 10(A) defines "utilities" to include HVAC, along with other common utilities.

According to GK, Article 10(B) means that if it establishes HVAC charges in the manner specified, it can charge Gap for HVAC directly. This would mean that if GK does not establish HVAC charges in the manner specified, HVAC costs are included as part of Center Expenses. GK, however, did not argue before the district

court that Gap owed it for HVAC costs under Article 10. It did not mention Article 10 in its Answer and Counterclaim. In its "Statement of Undisputed Material Facts" (in its memorandum supporting summary judgment) it said: "In addition to Tenant's obligation to pay its share of the Center Expenses, common area expenses, and HVAC expenses pursuant to Articles 5(B), 12(B), and 11(C) of the Lease, Article 10 of the Lease requires Tenant to pay for any utilities, such as water and sewer, that Landlord provides for the Premises." Later in that memorandum, GK argued that Article 10(B) obligated Gap to pay for water and sewer services, making no argument that 10(B) required Gap to pay for HVAC.

Ordinarily, this court "will not consider an argument raised for the first time on appeal." *United States v. Hirani*, 824 F.3d 741, 751 (8th Cir. 2016). However, this court has "the discretion to consider an issue for the first time on appeal where the proper resolution is beyond any doubt . . . or when the argument involves a purely legal issue in which no additional evidence or argument would affect the outcome of the case." *Weitz Co.v. Lloyd's of London*, 574 F.3d 885, 891 (8th Cir. 2009). This court has "addressed new arguments raised on appeal where the new issue is encompassed in a more general argument previously raised and no new evidence is presented on appeal." *Hirani*, 824 F.3d at 751.

GK waived its Article 10(B) argument because it did not raise it below and the exceptions do not apply. First, Gap's obligation for HVAC charges under Article 10(B) was not encompassed within a more general argument raised below. GK emphasized below that Article 11(C), specifically, required Gap to pay for HVAC expenses; GK's new argument invokes a separate portion of the lease. Second, while lease interpretation is a question of law, the applicability of Article 10(B) is not "a purely legal issue in which no additional evidence or argument would affect the outcome of the case." It is not clear that the lease unambiguously contemplates the application of Article 10(B) here. GK said in its Counterclaim that the lease includes HVAC expenses within Center Expenses. Article 1(I) states "Initial Estimated

-5-

Monthly Center Expenses: $ N/A," suggesting (as discussed below) that Gap had no Center Expenses liability and thus no HVAC liability. Additionally, the form lease's Article 1(M) ("Other Initial Monthly Charges") is crossed out, suggesting that the parties intended that Gap would not be charged for HVAC. And even if Article 10(B) did enable GK to charge Gap directly for HVAC, this court would have to determine whether GK established HVAC charges in the manner required by Article 10(B). GK waived the argument that Gap owes it for HVAC expenses under Article 10(B).

B.

GK argues that Article 5 of the lease requires Gap to pay Center Expenses. The lease defines "Center" as follows:

> 'Center' shall mean the building or structure in which the Premises are located and any other buildings or structures owned or ground leased by Landlord . . . and operated in conjunction therewith . . . together with the Common Areas, and all parcels or tracts of land owned or ground leased by Landlord . . . on which all or any portion of the foregoing items are located and any fixtures, Systems and Equipment, furniture and other personal property owned or leased by Landlord located thereon or therein and used in conjunction therewith . . . .

It defines "Center Expenses" at length. The definition begins:

> 'Center Expenses' shall mean all expenses, costs and amounts of every kind and nature which Landlord shall pay during any calendar year any portion of which occurs during the Term in connection with the management, repair, maintenance, replacement, insurance and operation of the Center, including, without limitation, any amounts paid for: (a) utilities, including but not limited to . . . heating, air conditioning and ventilating . . . .

-6-

Article 5(B) of the lease states that "Tenant shall pay Landlord an amount equal to Tenant's Proportionate Share of Center Expenses . . . ." (The "Tenant's Proportionate Share" is calculated by dividing the square footage of the tenant's premises by the total rentable square footage of the Center.) Article 5(B) then refers to Article 5(1):

> Notwithstanding anything contained in this Lease to the contrary, Tenant shall pay no more than the amount set forth in Article 1(L) as Initial Estimated Monthly Center Expenses for the first twelve (12) months of the Term and thereafter the amount Tenant is obligated to pay on the annualized basis for Center Expenses for any one Lease Year shall not exceed the lesser of the following: (i) the actual amount of Tenant's Proportionate Share of Center Expenses computed in accordance with Article 28, or (ii) the amount of Center Expenses payable by Tenant for the immediately preceding Lease Year increased by five percent (5%). . . . The cap on increases in Center Expenses provided for herein shall not apply to the portion of Center Expenses for utility charges, Taxes and snow removal and, therefore, the maximum permitted increase in the amount which Tenant is obligated to pay on an annualized basis for Center Expenses, as hereinbefore provided, shall be based on the Center Expenses net of the portion thereof for utility charges, Taxes and snow removal.

The parties agree that the reference to "Article 1(L)" should say "Article 1(I)," which states "Initial Estimated Monthly Center Expenses: $ N/A."

1.

GK urges that Article 5 unambiguously requires Gap to pay no Center Expenses for the first 12 months of the lease, but then obligates Gap to pay the "Tenant's Proportionate Share of Center Expenses" for the remainder of the lease. The district court concluded that Article 5 unambiguously requires Gap to pay no Center Expenses for the duration of the lease. According to the district court, the lease requires Gap to

pay no Center Expenses for the first 12 months of the lease, then caps increases in Center Expenses at five percent of the preceding Lease Year's Center Expenses payable by Gap. The amount payable by Gap for the first 12 months was nothing. And since five percent more of nothing is nothing, the district court reasoned that Gap owes nothing.

Contrary to the district court's conclusion, the lease's language is ambiguous as to whether Gap is required to pay the Tenant's Proportionate Share of Center Expenses.

The key ambiguity is Article 1(I)'s statement that Gap's "Initial Estimated Monthly Center Expenses" are "$ N/A." "N/A" means "not applicable." *N*, **n., Oxford English Dictionary** (online version September 2016), *available at* http://www.oed.com/view/Entry/124731 (last visited December 5, 2016). A rational person could interpret "Initial Estimated Monthly Center Expenses: $ N/A" to mean that Gap does not owe Center Expenses for the first 12 months of the lease. But a rational person could interpret Article 1(I)—located at the beginning of the lease, and a "Basic Provision" of the lease—as saying that Center Expenses are not relevant to Gap's obligations at all. Had Article 1(I) said "$0," it would clearly indicate an *introductory* reprieve from Center Expenses liability. But saying "N/A" potentially indicates a *permanent* exemption.

A permanent-exemption reading is rational when "N/A" is read in context. True, this reading does not give effect to Article 5(1), and the lease should be interpreted "to give effect to every part if reasonably practicable." **N.D. Cent. Code § 9-07-06**. However, it is not always "reasonably practicable" to give effect to every part of a contract. Indeed, Article 1(I)'s "N/A" necessarily renders Article 5(1) ungrammatical and illogical. Article 5(1) refers to "the amount set forth in Article 1([I])." But the parties did not set forth an "amount" in Article 1(I)—they wrote "N/A." If one inserts "N/A" into Article 5(1), it reads: "Tenant shall pay no more

than 'N/A' for the first twelve (12) months of the Term." Since "no more than 'not applicable'" has no grammatical or logical meaning, it is not "reasonably practicable" to give effect to all parts of Article 5(1).

A rational argument can be made that Article 5(1) is inoperative in this agreement. In certain contexts, parts of a contract are inoperative when inconsistent with "introductory language" and the contract's "general intent." *See **Langer v. Pender***, 764 N.W.2d 159, 167 (N.D. 2009). *See also* **§ 9-07-15** ("Particular clauses of a contract are subordinate to its general intent."). A rational person could argue that this is such a context: Article 1(I) is part of the "Basic Provisions" at the beginning of the lease, and can plausibly reflect the parties' intent that Gap not be liable for Center Expenses for the duration of the lease. Since two rational arguments can be made about the meaning of Article 1(I)'s "N/A," the lease is ambiguous whether Gap owes for Center Expenses at all.[2]

2.

Because the lease contains an ambiguity, the parties' intent becomes a question of fact. ***Kaler***, 603 N.W.2d at 702. That question is answered with reference to extrinsic evidence. *Id.* *See also* **N.D. Cent. Code § 9-07-12** ("A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates."). "[T]he parties' conduct in the course of performance after the contract's formation can help determine the meaning of ambiguous language." ***Nat'l Bank of Harvey v. Int'l Harvester Co.***, 421 N.W.2d 799, 803 (N.D. 1988). Gap is entitled to summary judgment if a rational factfinder interpreting the facts most favorably to GK could not find for GK. *See **Torgerson v. City of Rochester***, 643 F.3d

---

[2]GK also argues that the district court erred in interpreting Article 5(1)'s limitation on increases. But a court only reaches that question if it resolves the ambiguity noted above by determining that Gap is obligated to pay for Center Expenses.

1031, 1042 (8th Cir. 2011) (en banc); ***Mandan Educ. Ass'n v. Mandan Pub. Sch. Dist. No. 1***, 610 N.W.2d 64, 66-67 (N.D. 2000).

Gap offers two pieces of evidence that the parties intended that Gap would not be required to pay for Center Expenses. First, Gap emphasizes the course of performance of the lease—for the first ten years of the lease, neither GK nor its predecessors ever charged Gap for Center Expenses (or CAM or HVAC). This suggests that the parties intended Article 1(I)'s "N/A" to exempt Gap from Center Expenses liability: A commercial landlord has incentives to collect money its tenants owe. Thus, GK and its predecessors' decision not to collect Center Expenses from Gap suggests they understood the language of the lease to impose upon Gap no obligation to pay for Center Expenses.

Second, Gap highlights an April 2005 "Estoppel Certificate" that GK sent to Gap. It states that Gap's "Monthly CAM Expenses" were "N/A/ mo." It also says that no amendments or modifications had been made to the lease. It states Gap's obligations to pay rent, taxes, and a percentage of its gross sales over a breakpoint. But it states no obligation to pay any Center Expenses or HVAC costs. The tenant estoppel certificate suggests that GK understood the lease not to require Gap to pay for Center Expenses. Together, the course of performance and estoppel certificate strongly support that "Initial Estimated Monthly Center Expenses: $ N/A" means that Gap has no obligation to pay Center Expenses for the duration of the lease.

Gap also offers evidence from lease negotiations (showing CAM and HVAC were included in Gap's rent) and a "Lease Analysis Worksheet" prepared by MetLife. GK argues that rational factfinders would have reasons not to credit the evidence from lease negotiations and that the worksheet is inadmissible. Accepting GK's points for the sake of argument, this court does not consider this evidence as part of its summary judgment analysis.

-10-

GK offers no extrinsic evidence or any reason that a rational factfinder would draw inferences in its favor from the course of performance or from the 2005 "Estoppel Certificate." Reading the ambiguous lease language in conjunction with the extrinsic evidence, a rational factfinder can reach only one conclusion in this case: The parties intended that Gap not be obligated to pay for Center Expenses for the duration of the lease. The district court's grant of summary judgment to Gap is affirmed.

C.

GK argues that under Article 11(C) of the lease, Gap must pay for maintenance and repair costs for HVAC units serving its space. Article 11(C) states:

> If the Premises are served by one or more HVAC units or other such systems or equipment that also serve one or more other tenants, Tenant shall at Landlord's option made by Landlord from time to time in writing either: (a) make arrangements directly with such other tenant or tenants to reasonably share responsibility and expenses for inspection, maintenance, repairs, operation and replacements of such items, or (b) reimburse Landlord for Tenant's reasonable share of all costs incurred by Landlord in making such arrangements or performing such work (such share to be based on the ratio of the square footage of the Premises to the square footage of the areas leased to such other tenant or tenants, or at Landlord's option such other factors as Landlord shall deem reasonable).

GK is correct that, under Article 11(C), it can charge Gap for costs related to HVAC maintenance and repair. The district court's declaration that "Gap has no obligation to pay CAM expenses or HVAC expenses for the duration of the Lease" is too broad. On remand, the district court should modify its decision to state that "Gap has no obligation to pay CAM expenses or HVAC expenses, except those established under Article 11(C) of the Lease, for the duration of the Lease." Because

-11-

GK points to no evidence that its past HVAC charges were established under Article 11(C), this modification does not affect the district court's determination that GK breached the lease or its damages award.

\* \* \* \* \* \* \*

The judgment of the district court is affirmed, modified in part, and remanded for proceedings consistent with this opinion.

_____